# 24-2748-cv

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

GRANITE STATE INSURANCE COMPANY and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,

*Plaintiffs-Appellees*,

– v. –

PRIMARY ARMS, LLC,

*Defendant-Appellant*.

On Appeal from an Order of the
United States District Court for the Southern District of New York

**BRIEF OF APPELLANT**

Alexander T. Brown
Alana M. McMullin
Lathrop GPM LLP
*Attorneys for Defendant-Appellant*
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
(816) 292-2000

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant Primary Arms, LLC ("Primary Arms"), by its counsel, certifies that Primary Arms is a limited liability company formed under the laws of the State of Texas, that Primary Arms has no parent corporation, and that Primary Arms is not publicly traded, and, therefore, there is no publicly held corporation that owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

**Page**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUE...............................................................1

STATEMENT OF THE CASE.................................................................2

I.    Nature of Case and Procedural History ...........................................2

II.   The Underlying Lawsuits ...............................................................3

      A.    Factual allegations against Primary Arms in the Underlying
            Lawsuits..................................................................................3

      B.    The "Relevant Time Period" and the February 23, 2020 New
            York ban. ................................................................................7

III.  The Policies. ..................................................................................7

SUMMARY OF THE ARGUMENT ....................................................10

LEGAL STANDARD...........................................................................12

ARGUMENT .......................................................................................13

I.    Under Texas law, allegations that Primary Arms negligently caused
      injuries to others through its sales of unfinished frames and receivers
      potentially alleges an "occurrence" under products-completed
      operations coverage. ....................................................................13

      A.    The Underlying Lawsuits allege that Primary Arms' either
            negligently or knowingly caused injuries to New Yorkers
            through the sale of unfinished frames and receivers.  The fact
            that the pleadings allege both obligates the Insurers to defend
            Primary Arms. .......................................................................13

      B.    The Opinion's focus on "critical allegations" and reading the
            complaint "as a whole" impermissibly makes the duty to defend
            narrower than the duty to defend is.......................................16

      C.    The *Blue Bell* rubric does not apply...................................21

II.     If the Court finds that Texas law is unclear, it should certify the
        question to the Texas Supreme Court..............................................26

CONCLUSION.........................................................................................30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B) ............................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Buffalo v. Smith & Wesson Brands, Inc. et. al.*,
No. 1:23-cv-00066-FPG (W.D.N.Y.) ........................................................................2

*City of Rochester v. Smith & Wesson Brands, Inc., et al.*,
No. 6:23-cv-06061-FPG (W.D.N.Y.) .......................................................................2

*Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*,
73 F.4th 322 (5th Cir. 2023) ............................................................ 21, 22, 23, 26

*Ewing Const. Co., Inc. v. Amerisure Ins. Co.*,
690 F.3d 628 (5th Cir. 2012) ...............................................................................28

*Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*,
197 F.3d 720 (5th Cir. 1999) ...................................................... 13, 14, 22, 23

*Gann v. Anheuser-Busch, Inc.*,
394 S.W.3d 83 (Tex. App. 2012) .........................................................................26

*Georgitsi Realty, LLC v. Penn-Star Ins. Co.*,
702 F.3d 152 (2d Cir. 2012) .................................................................................27

*Granite State Ins. Co. v. Primary Arms, LLC*,
No. 23 CIV. 7651 (LGS), 2024 WL 4008167 (S.D.N.Y. Aug. 30, 2024) ............3

*GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308–10
(Tex. 2006) ...........................................................................................................19

*Home Insurance Co. v. 39 American Home Products*,
873 F.2d 520 (2d Cir. 1989) ........................................................................ 27, 28

*In re Acad., Ltd.*,
625 S.W.3d 19 (Tex. 2021) ...................................................................................24

*Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.*,
303 F.3d 419 (2d Cir. 2002) .................................................................................12

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
242 S.W.3d 1 (Tex. 2007) ......................................................... 13, 20, 21, 22, 29

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
   428 F.3d 193 (5th Cir. 2005) ...................................................................29

*Madden v. Creative Services, Inc.*,
   24 F.3d 394 (2d Cir. 1994) ......................................................................28

*New York v. Arm or Ally, LLC, et al.*,
   No. 1:22-cv-06124-JMF (S.D.N.Y.) ......................................... 2, 3, 16

*New York v. Arm or Ally, LLC*,
   No. 22-CV-6124 (JMF), 2024 WL 2270351 (S.D.N.Y. May 20, 2024) ...... 18, 19

*Riordan v. Nationwide Mutual Fire Insurance Co.*,
   977 F.2d 47 (2d Cir. 1992) ......................................................................27

*VanDerStok v. Garland*,
   86 F.4th 179 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390, 218 L. Ed. 2d 679
   (2024) ......................................................................................... 18, 24

*Zurich Am. Ins. Co. v. Nokia, Inc.* (*"Nokia"*),
   268 S.W.3d 487 (Tex. 2008) .......................................................... passim

**Statutes**

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 132 ...........................................................................................1

28 U.S.C. § 2201 .........................................................................................1

Lawful Commerce Arms Act ....................................................................24

N.Y. Executive Law § 63(12) ...............................................................5, 18

N.Y. General Business Law § 349 ...............................................................5

N.Y. General Business Law § 350 ...............................................................5

N.Y. General Business Law § 898-c .............................................................5

New York's Executive Law .......................................................................19

Pub. L. 90-618, Title I, § 101, 82 Stat. 1213, 1213 (Oct. 22, 1968) .........24

**Rules**

Fed. R. App. P. § 32(a)(7)(B) ...................................................................30

Fed. R. App. P. § 32(f) ..............................................................................31

L. R. 27.2.................................................................................... 27, 28, 29

Tex. R. App. P. 58.....................................................................................27

Tex. R. App. P. 58.1................................................................... 27, 28

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1332 and 2201. The Plaintiffs/Counter-Defendants, Granite State Insurance Company, a citizen of Illinois and New York, and National Union Fire Insurance Company of Pittsburgh, Pa., a citizen of Pennsylvania and New York, (collectively, the "Insurers"), are citizens of different states than Defendant/Counter-Plaintiff Primary Arms, a citizen of Texas, and the amount in controversy in this action exceeds $75,000. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered final judgment disposing of all parties' claims on September 17, 2024, and Appellant Primary Arms filed a timely notice of appeal on October 16, 2024.

## STATEMENT OF THE ISSUE

Under Texas law, does a lawsuit alleging that a firearm retailer negligently caused injuries to others through its sales of unfinished frames and receivers potentially allege an "occurrence" under products-completed operations liability coverage?

## STATEMENT OF THE CASE[1]

### I.  Nature of Case and Procedural History

This is an insurance coverage dispute as to whether the Appellee-Insurers (the "Insurers") have a duty to defend Appellant-Policyholder Primary Arms ("Primary Arms") under products-completed operations liability policies in connection with three lawsuits filed by New York, Rochester, and Buffalo (the "Underlying Lawsuits").[2]  The Underlying Lawsuits allege that Primary Arms failed to control the sale and distribution of unfinished frames and receivers which either "negligently" or "knowingly" resulted in injuries and damages to New Yorkers (including alleged increases in suicides, homicides, intimate partner violence, and property damage).

The Parties agree that Texas substantive law governs but dispute whether the Underlying Lawsuits potentially support a covered claim (which is the duty-to-defend standard).  Specifically, the Parties dispute whether the Underlying Lawsuits potentially allege (1) an "occurrence" or (2) damages "because of" bodily injury or property damage under Texas law.

---

[1]  References to "A__" are references to the Joint Appendix, filed concurrently herewith. References to "ROA __" are references to documents in the Record on Appeal – Electronic Index that are not included in the Joint Appendix.

[2]  The Underlying Lawsuits are *New York v. Arm or Ally, LLC, et al.*, No. 1:22-cv-06124-JMF (S.D.N.Y.) ("New York Lawsuit"); *City of Buffalo v. Smith & Wesson Brands, Inc. et. al.*, No. 1:23-cv-00066-FPG (W.D.N.Y.) ("Buffalo Lawsuit"); and *City of Rochester v. Smith & Wesson Brands, Inc., et al.*, No. 6:23-cv-06061-FPG (W.D.N.Y.) ("Rochester Lawsuit").

2

In late 2023 and early 2024, the Parties filed cross-motions for partial summary judgment on the Insurers' duty to defend (the "SJ Motions").[3]  On August 30, 2024, Judge Lorna G. Schofield issued an Opinion and Order (the "Opinion")[4] granting the Insurers' SJ Motion on the "occurrence" issue without reaching the second issue.[5]  Primary Arms appeals this Opinion.

## II.  The Underlying Lawsuits

### A.  Factual allegations against Primary Arms in the Underlying Lawsuits.

In their SJ Motion briefings on the duty to defend, the Parties principally focused on the operative Second Amended Complaint in the New York Lawsuit (the "New York Complaint") because most of the allegations therein are substantially similar to those in the Buffalo and Rochester Lawsuits.[6]

The New York Complaint is brought against Primary Arms and nine other separate, unrelated, geographically-disperse firearms and firearm parts retailers.[7]

---

[3] *See* A8-9, Docket Entries 37-46.

[4] The Opinion is published at *Granite State Ins. Co. v. Primary Arms, LLC*, No. 23 CIV. 7651 (LGS), 2024 WL 4008167 (S.D.N.Y. Aug. 30, 2024).  The Opinion is located at A215-224.

[5] *See* Opinion, A223, fn 2 ("This decision does not address whether the Underlying suits are outside the scope of the Policies' coverage for the additional reason that they do not allege 'bodily injury' or 'property damage.'").

[6] *See, e.g.,* Insurers' Memorandum of Law in Support of their Motion for Partial Summary Judgment, ROA38, p. 4; Primary Arms's Memorandum in Opposition and in Support of its Cross-Motion for Partial Summary Judgment, ROA42, pp. 2-5.

[7] *See* Second Amended Complaint in *New York v. Arm or Ally, LLC, et al.*, No. 1:22-cv-06124-JMF (S.D.N.Y.), ECF No. 157 (the "New York Complaint").

The New York Complaint contains 635 allegations spanning 124 pages and 7 causes of action. *Id.* The majority of these allegations are made collectively against "all defendants" or "each defendant" without specific reference to Primary Arms. *Id.* One section of the New York Complaint—entitled "**H. Primary Arms**" (¶¶ 495-526)—specifically focuses on Primary Arms' alleged conduct. A144-148.

As alleged in the New York Complaint, Primary Arms is a Texas limited liability corporation with its headquarters in Houston, Texas. A141 at ¶ 16. Primary Arms is "an online retailer of firearms, parts, and paraphernalia who marketed and repeatedly sold unfinished frames and receivers to New Yorkers[.]" A144 at ¶ 495.

According to the New York Complaint, "[f]or a substantial segment of the Relevant Time Period [between June 2016 and June 29, 2022 as defined at A141 at ¶ 19], Primary Arms shipped unfinished frames and receivers directly to New York consumers, with no serialization and no background check." A145 at ¶ 498. "Primary Arms sent at least 25,428 packages into New York State between July 25, 2016, and August 9, 2022." *Id.* at ¶ 500. "At least 1,305 of these shipments were sent into New York City after February 23, 2020[,]" and "[a]t least 835 of these shipments were sent into New York State after April 26, 2022[.]" A145-146 at ¶¶ 501-502. "A significant portion of each group of [these] shipments . . . contained unfinished frames and receivers." A146 at ¶ 503.

The New York Complaint alleges that Primary Arms sent nine packages of unfinished frames or receivers to various people from May 15, 2018 to May 26, 2021, some of which were sent to people who did not have licenses to possess or own firearms. A146-148 at ¶¶ 504-525. According to the New York Complaint, Primary Arms' sales to these nine people "demonstrate the complete and persisting lack of controls that Primary Arms employs in order to keep its ghost gun products out of the hands of people who are prohibited from accessing firearms[.]" A148 at ¶ 526.

The New York Complaint asserts the following claims against all Defendants, including Primary Arms: (1) "Repeated and Persistent Illegality in Violation of N.Y. Executive Law §63(12)"; (2) "Repeated and Persistent Fraudulent Conduct in Violation of N.Y. Executive Law §63(12)"; (3) "Public Nuisance Pursuant to N.Y. General Business Law §898-c"; (4) "Violation of N.Y. General Business Law §349"; (5) "Violation of N.Y. General Business Law §350"; (6) "Negligence Per Se"; and (7) "Negligent Entrustment." A161-171. According to the New York Complaint, each Defendant was "under a duty to entrust [their products] to a responsible person whose use would not create an unreasonable risk of harm to others" and breached that duty through their sales. A157 at ¶¶ 629-630.

As alleged, "Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety." A157 at ¶ 594. Defendants'

5

shipments of unfinished frames and receivers have been used by third persons to craft "ghost guns," and "[t]he influx of ghost guns into New York is a significant threat to public health and safety." A151 at ¶ 574. This "harm[s] New Yorkers" by "increasing the number of firearms likely to be used in the commission of a crime," "diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence," and "increasing the number of murders and suicides." A151-158 at ¶¶ 574-595.

The Underlying Complaints also allege the influx of privately made firearms has caused property damage such as thefts, robberies, physical damage to properties, and loss of use of public streets, sidewalks, and parks. *See, e.g.*, Buffalo Complaint, A175 at ¶ 46 (alleging "injury to persons or property within New York State"); A176 at ¶ 144 (allegation of stolen property); A177 at ¶ 278 ("Ghost guns make Buffalo's streets, schools, public spaces, and homes… significantly more dangerous."); *Id.* at ¶ 279 ("Ghost guns have also been used to perpetrate violent crimes on city streets, including multiple murders, as well as non-fatal shootings."); A178 at ¶ 284 (increased robberies); A181 at ¶ 507 ("Defendants have created, contributed to, and maintained a public nuisance that … deprives City of Buffalo residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large

numbers of residents of the City of Buffalo."); Rochester Complaint, A183-190 at ¶¶ 45, 139, 285-287, 513 (same).

**B. The "Relevant Time Period" and the February 23, 2020 New York ban.**

The New York Complaint seeks damages for alleged sales of unfinished frames and receivers between June 2016 and June 29, 2022 (the "Relevant Time Period"). A141 at ¶ 19. On April 16, 2022, the State of New York banned the sale of unfinished frames and receivers into New York. A53 at ¶¶ 96-98. The New York Complaint also alleges that on February 23, 2020, the New York City Administrative Code illegalized the possession of unfinished frames and receivers. A54-55 at ¶ 104. For purposes of this Appeal only, Primary Arms will refer to February 23, 2020, as the "**2020 New York Ban Date**."

**III. The Policies.**

As noted above, the New York Complaint seeks damages for shipments of unfinished frames and receivers between June 2016 and June 29, 2022 (the "Relevant Time Period"). The Insurers provided coverage to Primary Arms during this "Relevant Time Period," including the four years predating the "**2020 New York Ban Date.**" Specifically, the Insurers issued to Primary Arms six commercial general liability policies and six commercial umbrella policies effective annually from July 4, 2017, through April 6, 2023 (collectively, the "Policies"). A16-17.

The Policies provide many millions of dollars in limits[8] for damages that fall within the "products-completed operations hazard." As reflected below in the definitions of "[p]roducts-completed operations hazard" and "[y]our products," products-completed operations coverage protects policyholders from lawsuits alleging bodily injury or property damage "arising out of" the policyholder's "products," including "any goods or products … manufactured, sold, handled, distributed, or disposed of" by the policyholder as well as any alleged "providing of or failure to provide warnings or instructions" in connection with the sale of those products.

In relevant part, the insuring agreements of the Policies provide as follows:

**SECTION I – COVERAGES**

**COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.**     **Insuring Agreement**

**a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages….

***

**b.**     This insurance applies to "bodily injury" and "property damage" only if:

---

[8] *See, e.g.,* A193 ($2 million "products/completed operations aggregate limit"); A28 ($5 million in "products-completed operations aggregate").

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period…

\*\*\*

## SECTION V – DEFINITIONS

**3.**  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**13.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"…

**17.**  "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it….

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;..

b. Includes:

9

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

\*\*\*

*See* A192-197.[9]

## SUMMARY OF THE ARGUMENT

Primary Arms is a Texas-based retailer who sells firearms and firearm products, including unfinished frames and receivers. Primary Arms paid high premiums to the Insurers for "products-completed operations coverage" for the exact purpose of protecting itself from lawsuits alleging that these firearm products caused bodily injury or property damage to other. However, now that Primary Arms has been sued for injuries arising out of the sale of its products in the Underlying Lawsuits, the Insurers have denied any duty to defend and indemnify Primary Arms, purportedly on the basis that the sale of these products was voluntary or intentional (which they argue cannot constitute an "occurrence" under Texas law).

But this misconstrues the applicable "occurrence" analysis. While the Texas Supreme Court has not specifically evaluated whether injuries allegedly resulting from the sale of firearms or firearm products implicates products-completed

---

[9] Because the insuring agreements in the Policies are substantially similar, the Parties stipulated to using exemplar forms.

10

operations liability coverage, the Texas Supreme Court **has** ruled in other products-completed operations cases that the applicable "occurrence" analysis is whether the seller necessarily expected or intended the alleged injuries or damages. And, where (as here) there are allegations that resulting injuries or damages were not necessarily intended, the Texas Supreme Court has ruled that insurers have a duty to defend. *Zurich Am. Ins. Co. v. Nokia, Inc.* (*"Nokia"*)*,* 268 S.W.3d 487, 495 (Tex. 2008) ("[T]he factual allegations here support a duty [to defend]. The pleadings allege both intentional conduct (Nokia knew of RFR's harmful effects and nonetheless intentionally sold its products to consumers) and negligence (Nokia should have known of RFR's harmful effects).").

As respects the Opinion, the District Court's focus on what it calls "critical allegations" that **negate** the potential for coverage is inimical to the duty-to-defend analysis. Instead, the correct analysis requires the court to read the pleadings "liberally" in favor of coverage and evaluate whether there are allegations that **support** (not **negate**) the potential for coverage. Additionally, the duty to defend focuses on factual allegations as opposed to "legal theories." However, the Opinion erroneously focuses on allegations that reflect the Underlying Plaintiffs' (disputed) "legal theory" that the sale of unfinished frames and receivers without background checks was "illegal," "prohibited," or regulated by federal law in the first instance.

Finally, the Opinion reflects a normative analysis by the Southern District of New York that the selling of unfinished frames and receivers without conducting background checks is intentionally harmful conduct. But a Texas court would not view the selling of unfinished frames and receivers without conducting background checks as intentionally harmful conduct—which is the crux of this Court's *Erie* analysis.

In sum, the Court should reverse the District Court's decision granting summary judgment to the Insurers and find, as a matter of Texas law, that the Underlying Lawsuits potentially allege an "occurrence" under the Insurers' products-completed operations liability coverage. Alternatively, the Court should certify the question to the Texas Supreme Court.

## LEGAL STANDARD

The Parties agree that Texas substantive law applies. The District Court's Opinion granting partial summary judgment to the Insurers is subject to *de novo* review. *Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.,* 303 F.3d 419, 423 (2d Cir. 2002) ("We review a district court's grant of summary judgment *de novo*…").

## ARGUMENT

**I.** **Under Texas law, allegations that Primary Arms negligently caused injuries to others through its sales of unfinished frames and receivers potentially alleges an "occurrence" under products-completed operations coverage.**

    **A.** **The Underlying Lawsuits allege that Primary Arms' either negligently or knowingly caused injuries to New Yorkers through the sale of unfinished frames and receivers. The fact that the pleadings allege both obligates the Insurers to defend Primary Arms.**

While there are no Texas cases evaluating whether injuries allegedly resulting from the sale of firearm or firearm products implicates coverage under liability policies issued to firearm retailers, the Texas Supreme Court has ruled that "products-completed operations coverage" covers injuries and damages that were not expected or intended by the seller. *Nokia, Inc.,* 268 S.W.3d at 495. Thus, allegations that a retailer knew or alternatively "should have known" their products would cause the alleged injuries is sufficient to trigger an insurer's obligation to defend. *Id.; see also Lamar Homes, Inc. v. Mid-Continent Cas. Co.* ("*Lamar Homes*")*,* 242 S.W.3d 1, 9 (Tex. 2007) (in products-completed operations case, the duty-to-defend inquiry is whether "direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort)" and finding that the complaint potentially alleged an "occurrence" because "[n]o one alleges that Lamar intended or expected its work or its subcontractors' work to damage the DiMares' home"); *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*

("*Grapevine*"), 197 F.3d 720, 726 (5th Cir. 1999) (in products-completed operations case, allegations that policyholder "'caused damage which is undesigned and unexpected' … constitutes an 'accident' within the definition ascribed to that term by the Texas Supreme Court.").

Here, the factual allegations against Primary Arms are that (1) it shipped "at least 25,428" packages into New York between July 25, 2016 and August 9, 2022 (the "Relevant Time Period"), a "significant portion" of which "contained unfinished frames and receivers"; (2) some of these packages were sent to people who did not have licenses to possess or own firearms; and, according to the New York Complaint, these facts demonstrate (3) a "lack of controls" by Primary Arms as respects to keeping its "products out of the hands of people who are prohibited from accessing firearms." *See* Statement of the Case, § II.A, *supra*. Importantly, while the *sales* of these firearm products were intentional, there are no allegations in the Underlying Lawsuits that *resulting injury and damage*—*i.e.,* increases in suicides, domestic violence, homicides, and property damage—was expected or intended. To the contrary, the New York Complaint alleges that Primary Arms' actions either "negligently" or "knowingly" caused this harm. A157 at ¶ 594 ("Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety"). Accordingly, under Texas Supreme Court law, the Underlying Lawsuits plainly allege the potential for an "occurrence."

The Texas Supreme Court decision in *Nokia* is analogous and directly on point. There, the underlying lawsuits sought to hold Nokia liable for selling wireless telephones that caused radiation poisoning:

> This class action seeks damages and declaratory relief on behalf of plaintiff and a class of persons who purchased or leased wireless handheld telephones ("WHHPs").... Through a common and uniform course of conduct, the defendants have manufactured, supplied, promoted, sold, leased and provided wireless service for WHHPs when they knew or should have known that their products generate and emit radio frequency radiation ("RFR") that causes an adverse cellular reaction and/or cellular dysfunction ("biological injury") through its adverse health effects on: calcium and ion distribution across the cell membrane; melatonin production; neurological function; DNA single and double strand breaks and chromosome damage; enzyme activities; cell stress and gene transcription; and the permeability of the blood brain barrier (hereinafter collectively described as the "health risk" and/or the "biological effects"). Through a common and uniform course of conduct, the defendants, acting individually and collectively, failed to adequately disclose to the consuming public the fact that WHHPs emit RFR that causes biological injury and a risk to the users' health. The purpose of this action is to hold accountable and to obtain maximum legal and equitable relief from those corporations and entities that are responsible for producing and placing into the stream of commerce WHHPs which create a health risk to users by causing biological injury.

*Nokia,* 268 S.W.3d at 492. Like here, the insurers in *Nokia* argued there was no potential for an occurrence because the underlying lawsuits included numerous allegations of intentional misconduct (along with related causes of action for fraud, civil conspiracy, battery, violations of consumer protection acts, etc.).

Ultimately, however, the Texas Supreme Court found the underlying lawsuits did allege the potential for an "occurrence" because there were allegations that Nokia

either (1) knew their products would cause radiation poisoning or (2) ***should have***

***known*** their products would cause radiation poisoning:

> [T]he factual allegations here support a duty. The pleadings allege both intentional conduct (Nokia knew of RFR's harmful effects and nonetheless intentionally sold its products to consumers) and negligence (Nokia should have known of RFR's harmful effects). The insurers argue that the intentional tort allegations defeat the duty to defend. Standing in isolation, they might. We cannot, however, ignore the plaintiffs' other allegations when determining that duty. *See* 22 Holmes' Appleman on Insurance 2D § 136.2(D) (noting that, "when there are covered and non-covered claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least until it can limit the suit to those claims outside of the policy coverage").

*Id.* at 495.

In sum, the *Nokia* analysis applies here because the Underlying Lawsuits do not allege that Primary Arms expected or intended the sale of their products would cause the bodily injuries or property damage complained about in the Underlying Lawsuits. Instead, the New York Lawsuit specifically alleges that Defendants "knowingly, ***negligently***, and/or recklessly" caused the alleged harms, which is sufficient to implicate an "occurrence" under the Insurers' products-completed operations coverage issued to firearm retailers.

**B.      The Opinion's focus on "critical allegations" and reading the complaint "as a whole" impermissibly makes the duty to defend narrower than the duty to defend is.**

The Opinion casts aside Primary Arms' duty-to-defend analysis, contending that Primary Arms' "***exclude[s] critical allegations***" and that the duty to defend is

based on reading the pleadings "*as a whole*." Opinion, A221-222 (emphasis added). But this is the wrong framework under Texas law. The duty to defend is *not* based on reading the complaint "as a whole" but instead is based on whether there are *any* allegations that "potentially support a covered claim":

> An insurer must defend its insured if a plaintiff's factual allegations potentially support a covered claim…. We resolve all doubts regarding the duty to defend in favor of the duty, and we construe the pleadings liberally. Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy…. If a complaint potentially includes a covered claim, the insurer must defend the entire suit.

*Nokia,* 268 S.W.3d at 489.

Moreover, while the Opinion emphasizes that the duty to defend is based on "factual allegations" as opposed to "legal theories" (A219), the so-called "critical allegations" identified by the Opinion are mostly iterations of a disputed legal premise—to wit, that the sale of unfinished frames and receivers without background checks was "illegal," "prohibited," or otherwise regulated by federal gun laws in the first instance.[10] Notably, as of the time of this filing, at least one Federal Court of

---

[10] *See, e.g.* Opinion, A222, *citing* New York Complaint at A55, ¶ 106 ("Despite the *illegality* of their conduct, each Defendant has intentionally and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York.") (emphasis added); *Id.,* citing New York Complaint at A63, ¶ 588 ("Defendants here have done and continue to do nothing to geographically restrain the marketing of their *prohibited products*, and they employ policies and practices that result in sales of these *illegal products* directly to unknown and deliberately unchecked individuals in New York.") (emphases added); *Id.,*

17

Appeals (the Fifth Circuit) has expressly *rejected* Underlying Plaintiffs' "legal theory" that the sale of unfinished frames and receivers is regulated by federal law. *VanDerStok v. Garland* ("*VanDerStok*"), 86 F.4th 179 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390, 218 L. Ed. 2d 679 (2024).

Further to the point, the Southern District of New York itself recently granted interlocutory appeal on Underlying Plaintiffs' "legal theory" that the sale of unfinished frames and receivers without background checks was violative of federal law. *See New York v. Arm or Ally, LLC*, No. 22-CV-6124 (JMF), 2024 WL 2270351 (S.D.N.Y. May 20, 2024). In his Order granting interlocutory appeal, Judge Jesse Furman explains that—should the firearm retailers prevail on the federal law issues—the Underlying Plaintiffs "marquee claims" regarding the legality of the sales under federal law would be knocked out of the Underlying Lawsuits entirely:

> More than half of the allegations underlying the State's claim under Executive Law Section 63(12) concern violations of federal law — which hold up only if Defendants' products were "firearms" within the meaning of Section 921(a)(3) — and its deceptive marketing claims rely in substantial part on the allegation that Defendants misrepresented federal "legal requirements applicable to their sales of guns" — which again, are relevant only if Defendants' products qualified as "firearms." *See* SAC ¶¶ 596-605, 618-23. Furthermore, these allegations are *the* reason that this case, which was originally filed in New York state court, is in federal court; Defendants removed the case, and the Court denied the State's motion to remand, on the ground that the question of "whether the products at issue are 'firearms' or 'component parts' thereof within the meaning of federal law" is a "substantial question of

---

citing New York Complaint at A51, ¶ 81 ("Defendants specifically market the unfinished frames and receivers as designed to evade *federal gun laws.*") (emphasis added).

federal law." *New York v. Arm or Ally, LLC*, 644 F. Supp. 3d 70, 76, 83 (S.D.N.Y. 2022) ("*Remand Op.*") (ECF No. 58). Accordingly, reversal of the Court's holding that Defendants' products qualified as "firearms" under federal law during the Relevant Time Period would "significantly affect the conduct of the action" by removing much of the support for the State's marquee claims under New York's Executive Law and General Business Law.

*Id.* at *3. Thus, while Judge Schofield opines that "critical allegations" as to the illegality of the sales negates any potential duty to defend in this case, Judge Furman opines these same "critical allegations" could be dismissed from the Underlying Lawsuits entirely. This inconsistency highlights why allegations against a policyholder must be "liberally construed in favor of coverage" when evaluating the prophylactic duty to defend. *See GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308–10 (Tex. 2006) ("factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend").

Similarly, the Opinion concludes there is no coverage because Primary Arms' shipments were allegedly made "after New York's ban on unfinished frames and receivers." Opinion, A222. But there is no Texas case suggesting that the actual or alleged illegality of conduct is relevant to the "occurrence" analysis. Moreover, Judge Schofield misses that the New York Complaint seeks damages mostly for sales that predate the "**2020 New York Ban Date**." Specifically, the New York Complaint alleges that Primary Arms sent "25,428 packages" during the "Relevant Time Period" (2016-2022), but that only *1,305* of these packages (*or 5%*) are alleged

to have been sent subsequent to the **2020 New York Ban Date.** New York Complaint, A145-146, at ¶¶ 500–502 (alleging that 1,305 out of the 25,428 packages at issue were shipped after February 23, 2020). This means the vast majority of packages at issue (***95%***) are ***not*** alleged to have been sent "after New York's ban on unfinished frames and receivers," contrary to what the Opinion suggests.

Lastly, the Opinion focuses on an allegation in the New York Complaint that "ghost guns may have become a 'weapon of choice' in violent crimes and are disproportionately used in such crimes as compared to traditional, registered firearms." Opinion, A222. But this allegation refers to the results of a study that was not published until ***February 3, 2022***—meaning that the study ***post-dates Primary Arms' alleged sales at issue***. *See* New York Complaint at A154, ¶ 586. Thus, this study does not (because it cannot) support the Opinion's ultimate conclusion that Primary Arms knew its sale of unfinished frames and receivers would have the "predicable outcome of increasing gun violence." Opinion, A223. Nor is foreseeability even the applicable standard. *See Lamar Homes,* 242 S.W.3d at 8 (rejecting "foreseeability as the boundary between accidental and intentional conduct" as this construction "would undermine the basis for most insurance coverage"). At the very least, neither this study nor any other allegation in the Underlying Lawsuits suggests that Primary Arms knew (much less expected or intended, which is the applicable legal standard) that the sales of its products would

result in the alleged injuries unrelated to violent crimes—such as alleged increases in the number of suicides and "intimate partner violence." *See Lamar Homes,* 242 S.W.3d at 9 (finding there was a potential for an "occurrence" because pleadings did not allege that policyholder "intended or expected its work" would cause some of the alleged third-party property damage).

### C.  The *Blue Bell* rubric does not apply.

Finally, the Opinion chiefly relies on the Fifth Circuit's decision in *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322 (5th Cir. 2023) ("*Blue Bell*")[11] which applied an "occurrence" analysis that focused on whether the policyholder's actions were "voluntary"—not whether the resulting injuries were expected or intended.[12]  However, the rubric in *Blue Bell* does not apply here for two separate and distinct reasons.

---

[11] In *Blue Bell,* the underlying lawsuit alleged breach of fiduciary duty by shareholders against Blue Bell's directors for allowing ice cream to be sold that was known to be tainted with *Listeria.* The shareholder complaint was replete with specific factual allegations establishing that the directors engaged in intentionally harmful conduct (*e.g.,* they were warned on numerous specific dates by numerous public health facilities and private laboratories of the impending *Listeria* outbreak but willfully disregarded the contamination risk nonetheless).

[12]  According to *Blue Bell:* "Under Texas law, a person's act is not an accident 'when [1] he commits an intentional act that [2] results in injuries that ordinarily follow from or could be reasonably anticipated from the intentional act.' We have noted that, in this context, 'an intentional act and the intent to cause injury are two distinct concepts.' To illustrate, 'the hunter who deliberately fires a gun at what he believes to be a deer but is actually a person' committed an 'intentional' act, even though the harm was not intentional. As such, the 'intentional acts' requirement is concerned with the voluntariness of an action or omission, not the actor's intended outcome." *Id.* at 329 (internal citations omitted).

First and foremost, the "occurrence" analysis in *Blue Bell* is not the analysis applicable to products-completed operations cases. As articulated by the Texas Supreme Court, products-completed operation coverage is specifically designed to protect policyholders from lawsuits alleging that the products it voluntarily or intentionally sold and marketed caused injury to others. *Nokia*, 268 S.W.3d at 500 ("The purpose [of completed operations coverage] … is to provide protection to the insured for personal injury or for property damage caused by the completed product but not for the replacement and repair of that product.") (internal citations omitted). Accordingly, the applicable "occurrence" analysis is whether the Underlying Lawsuits allege that Primary Arms necessarily expected or intended the alleged injuries from the sale of its firearm products, not whether its act of selling firearm products was voluntary or intentional. *Nokia,* 268 S.W.3d at 495; *Lamar Homes,* 242 S.W.3d at 8-9.

Second, though not explicitly stated therein, *Blue Bell* reflects a "dichotomy" in the occurrence analysis between Texas cases that allege solely intentionally harmful conduct (the so-called *"Maupin"* line of cases) versus cases that allege negligent conduct (the so-called "*Orkin*" line of cases). *See, e.g., Grapevine,* 197 F.3d at 723-25 (addressing the distinction between the two lines). "In the former [*Maupin* cases], the damage-causing acts of the tortfeasor are either actually or legally deemed to be intentionally harmful; in the latter [*Orkin* cases], the acts that

are performed intentionally are not intended to cause harm but do so as the result of negligent performance of those acts." *Id.* at 729. At bottom, *Blue Bell* reflects a determination by the Fifth Circuit that the willful sale of defective, disease-laden ice cream is intentionally harmful misconduct.

Here, the Opinion reflects a normative analysis by the Southern District of New York that the selling of unfinished frames and receivers without conducting a background check is intentionally harmful conduct. But a Texas court would ***not*** view the selling of unfinished frames and receivers without conducting a background check as intentionally harmful conduct—which is the crux of this Court's *Erie* analysis. Instead, far from constituting "intentionally harmful" misconduct, the Fifth Circuit *expressly* opined that the sale of unfinished frames and receivers unencumbered by federal law—for the assembly of what it calls "privately made firearms" (as opposed to "ghost guns")—is part of the nation's "rich history and tradition":

> "Because gunsmithing was a universal need in early America, many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 66 (2023). The tradition of at-home gun-making predates this nation's founding, extends through the revolution, and reaches modern times. *See id.* at 48 ("During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, the Americans needed to build their own arms to survive."). Considering this long tradition, "[t]he federal government has never required a license to build a firearm for personal use." *Id.* at 80. "In fact, there were *no* restrictions on the manufacture of arms for

personal use in America during the seventeenth, eighteenth, or nineteenth centuries." *Id.* at 78 (emphasis in original). And in perfect accord with the historic tradition of at-home gun-making, Congress made it exceedingly clear when enacting the GCA that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Pub. L. 90-618, Title I, § 101, 82 Stat. 1213, 1213 (Oct. 22, 1968). ATF's Final Rule alters this understanding by adding significant requirements for those engaged in private gun-making activities….

\*\*\*

This Old 80% Rule is thus easy to understand, predict, and apply: the top two silver receiver pictures are only 80% complete; they are thus "unfinished"; and they do not constitute "firearms" under federal gun laws. Under the Old 80% Rule, any law-abiding American consumer or manufacturer knew that as long as the fire-control area remained solid, the silver pieces of metal were just that—metal. They could be bought and sold without concern for the federal gun laws.

For decades, millions of Americans have lawfully purchased pieces of metal like those silver ones and worked on them in garages and workshops across the country. Such homemade firearms have a rich history and tradition, dating back to the Founding. *See, e.g.*, Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 45–71 (2023). So the Old Rule allowed Americans to purchase the silver pieces of metal, to machine the final 20% of the metal in their homes or garages, and thus to make 100%-complete receivers. *See* ROA.228–44 (ATF's pre-2022 Old Rule classification letters on partially complete frames and receivers). An enthusiast or amateur gunsmith might mill the fire-control area with a drill press so the receiver could hold a trigger assembly. And the enthusiast or amateur gunsmith might drill three holes through the receiver to hold the safety selector, trigger, and hammer pins. And voila: the modern analogue to the homemade rifle Daniel Boone's father gave him when he was 12.

*VanDerStok*, 86 F.4th at 185 (majority) and 199–200 (concurrence).

Similarly, while the Opinion wrongly accepts as a matter of law the very dispute being litigated in the Underlying Lawsuits (*i.e.,* that Primary Arms breached

a duty to protect others from the sale of their products), this same legal premise was expressly rejected by the Texas Supreme Court in *In re Acad., Ltd*., 625 S.W.3d 19 (Tex. 2021). There, victims of the 2017 Sutherland Springs church shooting filed multiple suits against a Texas firearm retailer who sold the out-of-state Colorado shooter a semi-automatic rifle fitted with a detachable thirty-round magazine that was illegal under Colorado law. *Id.* at 22–23. Ultimately, the Texas Supreme Court dismissed the lawsuit under the Protection of Lawful Commerce Arms Act on the basis that "businesses 'engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products ... are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse [such] products that function as designed and intended.'" In so ruling, the Texas Supreme Court held a firearm retailer could not be liable for injuries caused by the sale of its products so long as the "legal conditions of sale" were met. *Id.* at 25–30.

Then, the Texas Supreme Court turned to the plaintiffs' claim for negligent entrustment and specifically addressed the issue as to whether a firearms retailer has a duty to protect others from the sale of their products. The Texas Supreme Court expressly declined to recognize any such legal duty and, in doing so, rejected Section 390 of the Restatement of Torts which provides:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely

25

> because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Id.* at 30–32. This decision is consistent with longstanding Texas precedent that a retailer has no common law legal duty to protect others from the injurious use of their products by third persons. *See Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App. 2012), *citing Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998) ("Generally, no person has a legal duty to protect another from the criminal acts of a third person").

In sum, the Fifth Circuit's *Blue Bell* analysis does not preclude a duty to defend finding here both because (1) "voluntariness of action" is not the applicable "occurrence" standard in completed-operations cases and (2) neither the Fifth Circuit nor the Texas Supreme Court would view the sale of non-defective unfinished frames and receivers as "intentionally harmful" conduct.

## II. If the Court finds that Texas law is unclear, it should certify the question to the Texas Supreme Court.

Although there is sufficient precedent for the Court to resolve this appeal within the rubric of *Nokia*, if there are any doubts regarding whether products-completed operations coverage applies to allegations that a firearm retailer either "negligently" or "knowingly" caused injuries through the sale of its firearm products, the Court should certify the question to the Texas Supreme Court.

This Court's local rules provide that "[i]f state law permits, the court may certify a question of state law to that state's highest court" and that "[a] party may move to certify a question of state law by filing a separate motion or by including a request for certification in its brief." L.R. 27.2. Likewise, Rule 58 of the Texas Rules of Appellate Procedure and the Texas Constitution permit the Texas Supreme Court to "answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1; TEX. CONST. ART. V, § 3-c ("The supreme court and the court of criminal appeals have jurisdiction to answer questions of state law certified from a federal appellate court").

In deciding whether to certify a question, the Second Circuit considers: "(1) the absence of authoritative state court interpretations of [the law in question]; (2) the importance of the issue to the state, and whether the question implicates issues of state public policy; and (3) the capacity of certification to resolve the litigation." *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 158 (2d Cir. 2012). This Court has frequently certified questions to a state's highest court to resolve unclear and significant issues of state law, specifically those that arise in the insurance context. *See e.g., Home Insurance Co. v. 39 American Home Products*, 873 F.2d 520, 521–22 (2d Cir. 1989); *Riordan v. Nationwide Mutual Fire Insurance Co.*, 977 F.2d 47, 51 (2d Cir. 1992); *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d

152, 158 (2d Cir. 2012) (noting the "[r]esolution of this question will help determine the precise boundaries of property insurance policies in New York").

The requirements of Local Rule 27.2 and Texas Rule 58.1 are satisfied here. There is no Texas case addressing completed operations coverage arising out of the sale of firearm products. Further, whether retailers, distributers, and manufacturers of firearm products are covered under products-completed operations policies for injuries allegedly arising out of the sale of their products is a matter of significant importance to Texas and the companies who conduct business there (*see Argument,* § I.B, *supra*). Accordingly, "[t]he question is of obvious importance to the insurance industry and to those who buy insurance policies. There is no precedent on the issue now and [Texas] has a strong interest in deciding the issue certified rather than having the only precedent at point being that of the federal court which may be mistaken." *Home Ins. Co.*, 873 F.2d at 522, certified question accepted, 74 N.Y.2d 699, 541 N.E.2d 416 (1989), and certified question answered, 75 N.Y.2d 196, 550 N.E.2d 930 (1990); *Madden v. Creative Services, Inc.*, 24 F.3d 394, 397 (2d Cir. 1994) (certifying questions which "though arising infrequently, implicate policies of importance to the State of New York and its judicial system"); *Ewing Const. Co., Inc. v. Amerisure Ins. Co.*, 690 F.3d 628, 632–33 (5th Cir. 2012) certified question accepted Aug. 24, 2012 ("Where state law governs an issue, such policy factors are better gauged by the state high court than by a federal court on an *Erie* guess").

Pursuant to Local Rule 27.2, Primary Arms respectfully requests this Court certify to the Texas Supreme Court a question similar to the following:

> Under Texas law, does a lawsuit alleging that a firearm retailer negligently caused injuries to others through its sales of unfinished frames and receivers potentially allege an "occurrence" under products-completed operations liability coverage?

A similar question regarding the scope of an "occurrence" under a commercial general liability policy pursuant to Texas law was certified to – and answered by – the Texas Supreme Court in 2005. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.,* 428 F.3d 193, 195 (5th Cir. 2005), certified question accepted (Nov. 4, 2005), certified question answered, 242 S.W.3d 1 (Tex. 2007) (noting the certified question as: "When a homebuyer sues his general contractor for construction defects and alleges only damage to or loss of use of the home itself, do such allegations allege an 'accident' or 'occurrence' sufficient to trigger the duty to defend or indemnify under a CGL policy?")

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reverse the District Court's decision granting summary judgment to the Insurers and instead find, as a matter of Texas law, that the Underlying Lawsuits potentially allege an "occurrence" under the Insurers' products-completed operations liability coverage. In the alternative, the Court should certify this question to the Texas Supreme Court.


Dated: January 29, 2025

Respectfully submitted,

LATHROP GPM LLP

By: */s/ Alexander T. Brown*
Alexander T. Brown
Alana M. McMullin
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-292-2000

Attorneys for Defendant-Appellant,
Primary Arms, LLC

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)</u>

This brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 7,279 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).   In preparing this certificate, I relied on the word count program in Microsoft Word.


Dated: January 29, 2025                      */s/ Alexander T. Brown*
                                             Alexander T. Brown