# 24-2748-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————————

GRANITE STATE INSURANCE COMPANY, NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA.,

*Plaintiffs-Counter-Defendants-Appellees,*

v.

PRIMARY ARMS, LLC.,

*Defendant-Counter-Claimant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-COUNTER-
## DEFENDANTS-APPELLEES

JOHN GOERLICH
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000

CHRISTOPHER J. ST. JEANOS
JAMES E. FITZMAURICE
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Plaintiffs-Counter-Defendants-Appellees*

CP COUNSEL PRESS     (800) 4-APPEAL • (380724)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Granite State Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. are direct, wholly-owned (100%) subsidiaries of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation. No public company has an interest of 10% or more in American International Group, Inc.

# <u>TABLE OF CONTENTS</u>

**Page**

Statement Of The Issues ............................................................1

Statement Of The Case .............................................................1

    I.    The Factual Allegations In The Underlying Suits ...............................2

        A.    Primary's Sales Of "Ghost Gun" Kits Into New York ..............3

        B.    The Alleged Consequences Of Primary's Intentional Conduct ............................................................5

    II.    Primary's Insurance Program And Its Demand For Coverage ...........7

    III.    The Insurers' Coverage Lawsuits And District Court's Decision Finding There Is No Coverage For The Underlying Suits...................7

Summary Of The Argument ......................................................11

Legal Standard ..................................................................15

Argument.......................................................................15

    I.    The Underlying Suits Do Not Allege Bodily Injury or Property Damage Caused By An Accident........................................16

        A.    Under Texas Law, Harm That Ordinarily Follows From An Insured's Intentional Conduct Is Not Caused By An Accident. ...............................................16

        B.    Primary's Efforts To Escape *Cowan* Fail. ...............20

        C.    The Underlying Suits Allege Harms That Would Ordinarily Follow From Primary's Intentional Conduct. .........27

    II.    The Underlying Suits Do Not Allege "Damages Because Of 'Bodily Injury.'"................................................40

i

A.    Under The Consensus View, There Can Be No "Damages Because Of 'Bodily Injury'" Without Specific, Identifiable Injuries To Specific, Identifiable Individuals, Which The Underlying Suits Lack. ...........................................40

B.    The Counterarguments That Primary Made Before The District Court Are Unconvincing...............................................45

III.    There Is No Reason To Certify This Case To The Texas Supreme Court.....................................................................................48

Conclusion ...................................................................................................52

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*53rd St., LLC v. U.S. Bank N.A.*,
   8 F.4th 74 (2d Cir. 2021) ......................................................15, 51, 52

*In re Academy, Ltd.*,
   625 S.W.3d 19 (Tex. 2021)................................................................38

*ACE Am. Ins. Co. v. Rite Aid Corp.*,
   270 A.3d 239 (Del. 2022) ...............................................14, 41, 44, 46

*Acuity v. Masters Pharmaceutical, Inc.*,
   205 N.E.3d 460 (Ohio 2022) ................................................41, 44, 46

*Argonaut Sw. Ins. Co. v. Maupin*,
   500 S.W.2d 633 (Tex. 1973) .......................................................17, 25

*Bondi v. VanDerStok*,
   No. 23-852, 2025 WL 906503 (Mar. 26, 2025) ................................34

*Brainard v. Trinity Universal Co.*,
   216 S.W.3d 809 (Tex. 2006) ............................................................47

*Branham v. State Farm Lloyds*,
   No. 04-12-00190-CV, 2012 WL 3985925 (Tex. Ct. App. Sept. 12, 2012)........18

*Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*,
   829 F.3d 771 (7th Cir. 2016) ............................................................45

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005) .......................................................49, 50

*Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*,
   73 F.4th 322 (5th Cir. 2023) .....................................................*passim*

*Elliott Assocs., L.P. v. Banco de la Nacion*,
   194 F.3d 363 (2d Cir. 1999) .................................................14, 48, 51

*Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*,
   955 S.W.2d 81 (Tex. 1997).........................................................30, 32

*Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*,
197 F.3d 720 (5th Cir. 1999) ................................................................25

*GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*,
197 S.W.3d 305 (Tex. 2006) ................................................................15

*Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*,
387 S.W.2d 22 (Tex. 1965).........................................................34, 39

*Int'l Travelers' Ass'n v. Francis*,
23 S.W.2d 282 (Tex. 1930)......................................................................17

*Katerndahl v. State Farm Fire & Cas. Co.*,
961 S.W.2d 518 (Tex. Ct. App. 1997).....................................................31

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
242 S.W.3d 1 (Tex. 2007).............................................................*passim*

*Massachusetts Bonding & Insurance Co. v. Orkin Exterminating Co.*,
416 S.W.2d 396 (Tex. 1967) ......................................................25, 26

*Mid-Century Ins. Co. v. Lindsey*,
997 S.W.2d 153 (Tex. 1999) ......................................................19, 49

*Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Co.*,
640 S.W.3d 195 (Tex. 2022) ................................................................15

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines*,
939 S.W.2d 139 (Tex. 1997) ................................................................31

*Olson v. Major League Baseball*,
29 F.4th 59 (2d Cir. 2022) ......................................................16, 40

*Republic Nat'l Life Ins. Co. v. Heyward*,
536 S.W.2d 549 (Tex. 1976) ................................................................17

*State Farm Lloyds v. Kessler*,
932 S.W.2d 732 (Tex. Ct. App. 1996)..................................................32

*Trinity Universal Ins. Co. v. Cowan*,
945 S.W.2d 819 (Tex. 1997) .......................................................*passim*

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023), *rev'd sub nom. Bondi v. VanDerStok*,
    No. 23-852, 2025 WL 906503 (Mar. 26, 2025) ..................................................34

*Wessinger v. Fire Ins. Exch.*,
    949 S.W.2d 834 (Tex. Ct. App. 1997)...................................................18

*Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*,
    57 F.4th 558 (6th Cir. 2023) ...........................................................42, 45

*Zurich American Ins. Co. v. Nokia, Inc.*,
    268 S.W.3d 487 (Tex. 2008) ..........................................................20, 22, 43, 49

## Other Authorities

16 Appleman *Insurance Law & Practice* § 116.1(B) (2000) ..................................16

10 Couch on Insurance 3d § 139:14 (Nov. 2023)....................................................17

## STATEMENT OF THE ISSUES

1. Under Texas law, do underlying lawsuits alleging that an insured intentionally marketed and shipped unserialized, unlicensed firearm components to persons who were not legally permitted to possess them, leading predictably to an increase in gun violence, allege harm caused by an "accident," as that term is used in general liability insurance policies?

2. Under Texas law, do lawsuits asserting that government plaintiffs suffered jurisdiction-wide, public-nuisance-type damages as a result of the same conduct allege "damages because of 'bodily injury,'" as that phrase is used in commercial general liability insurance policies?

## STATEMENT OF THE CASE

In three underlying public nuisance lawsuits, the State of New York, the City of Buffalo, and the City of Rochester, respectively, seek to hold Appellant Primary Arms, LLC ("Primary"), among other defendants, liable for its alleged role in increasing gun violence by deliberately marketing, selling, and shipping "ghost gun" kits into those jurisdictions. *See generally New York v. Arm or Ally, LLC, et al.*, No. 1:22-cv-06124-JMF (S.D.N.Y.) (the "New York Action"); *City of Buffalo v. Smith & Wesson Brands, Inc., et al.*, No. 1:23-cv-00066-FPG (W.D.N.Y.) (the "Buffalo Action"); *City of Rochester v. Smith & Wesson Brands, Inc., et al.*, No. 6:23-cv-06061-FPG (W.D.N.Y.) (the "Rochester Action") (collectively, the "Underlying

- 1 -

Suits"). Those lawsuits allege that Primary shipped firearm components into New York that were easily convertible into functioning firearms; that Primary marketed those components to individuals who were not legally allowed to possess firearms as a means of avoiding that prohibition; and that Primary's marketing and shipment of firearm components to those individuals led to an upsurge in gun violence.

Primary seeks insurance coverage from its general liability insurers, Granite State Insurance Company ("Granite State") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (the Appellees and, collectively, the "Insurers"). Primary argues that the predictable harms that flowed from its intentional conduct in marketing and shipping ghost gun components into New York, as alleged in the Underlying Suits, somehow amount to harm caused by an "accident," a threshold requirement for triggering the Insurers' duty to defend under the insurance policies at issue. The District Court rightly rejected Primary's arguments. This Court should affirm.

## I.    The Factual Allegations In The Underlying Suits

For purposes of the Court's coverage analysis, the factual allegations of the complaints in each of the Underlying Suits should be reviewed in their entirety. Because the factual allegations against Primary in the New York Action are substantially similar to the allegations in the Buffalo and Rochester Actions, below the Insurers cite primarily to the factual allegations in the New York Action.

## A. Primary's Sales Of "Ghost Gun" Kits Into New York

A firearm is made of several parts, with the core of the firearm referred to as the "frame" (for a handgun) or the "receiver" (for a long gun like a rifle). A.39.[1] In recent years, gun manufacturers, distributors, and retailers have begun selling firearm kits that contain "unfinished" frames and receivers. A.38, 41. According to the Underlying Suits, those frames and receivers are "unfinished" in name only—"it takes very little time, effort, or skill to convert an unfinished frame[] or receiver into a working ghost gun," A.44, "so-named because they are untraceable and there is no record of their sale, or even their existence." A.40.

As alleged in the Underlying Suits, the appeal of ghost guns is straightforward—they permit a person to evade federal law and obtain a firearm even when that person is otherwise not legally permitted to do so. A.40. Federal law requires that a frame or receiver (both of which are statutorily defined as "firearms" under federal law) be shipped and sold with a serial number, and that sellers of firearms "keep records of the serial number of every weapon sold," which "ensures that when a gun is recovered in connection with a crime, law enforcement officers can query [a federal] database to quickly access critical information about the gun's origin and first owner." A.40, 48. In addition, federal law requires firearm

---

[1] References to "A\_\_" are references to the Joint Appendix, filed concurrently herewith. References to "ROA \_\_" are references to documents in the Record on Appeal – Electronic Index that are not included in the Joint Appendix.

purchasers to undergo a background check. A.47. But, "based on the fiction that Defendants' unfinished frames or receivers fall outside the federal definition of a 'firearm'" (and even though Primary repeatedly refers to such products as "firearms" or "firearm products" throughout its brief, *see* Primary Br. at 10, 13-14, 22, 26, 28), "Defendants have sold them directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime." A.40.

According to the allegations in the Underlying Suits, Primary's decision to ignore those requirements was entirely intentional. Indeed, those Suits are replete with allegations that the very purpose of Primary's intentional conduct was to circumvent federal gun laws, and that Primary specifically marketed its firearms as a way to circumvent those laws:

- "Defendants specifically market the unfinished frames and receivers as designed to evade federal gun laws." A.51.

- "Because of this built-in evasion of federal and state laws ... unfinished frames and receivers and the ghost guns made from them are naturally attractive to (and naturally marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them." A.41.

- "[E]ach Defendant has exploited demand for unfinished frames and receivers, which is primarily from consumers who cannot legally purchase firearms, for each Defendant's own financial benefit." A.45.

- "Defendants ... [engaged in] marketing efforts touting their products as a way around background checks and other public safety laws" and "operated to sell ghost gun products to buyers who were actively trying to evade the above-summarized federal gun laws." A.52-53.

- "Each Defendant *intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others*, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training." A.77 (emphasis added); *see also* A.93 (Buffalo); A.118-19 (Rochester).

Summing up, the Underlying Suits allege that, "[d]espite the illegality of their conduct," the defendants "*intentionally* and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York." A.55 (emphasis added).

## B.    The Alleged Consequences Of Primary's Intentional Conduct

According to the Underlying Suits, "Primary Arms' business practices have increased the number of dangerous ghost guns present in [New York]." A.57.  In fact, "[t]he available data shows that ghost guns are proliferating—and are being used in crimes—at an exponential pace....  According to the ATF, the number of ghost guns recovered at crime scenes nationwide increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in 2021." A.59-60.  Further, "[t]hroughout New York State..., the number of assembled ghost guns law enforcement recovered (and properly identified as such) increased from just 44 in 2018 to 797 in 2022—a 1,711% increase." A.60-61.

New York also alleges that the "increase in sales" of "ghost gun kits" has

"coincided with a massive uptick in gun murders in the United States" (an increase of 49% from 2015 to 2020) and that "[d]efendants' business practices ... are also related to an increase in suicide deaths." A.61-62. As a result, "[t]he influx of ghost guns into New York is a significant threat to public health and safety...." A.59. As New York alleged:

> Defendants ... affirmatively harm New Yorkers by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York.

A.59; *accord* A.87 (Buffalo); A.112-13 (Rochester).

The government plaintiffs in the Underlying Suits neither sustained bodily injury nor seek damages because of any specific bodily injuries. Instead, the government plaintiffs seek to recover the increased sums they have spent and will spend in the future to:

> (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

A.59; *accord* A.87-88 (Buffalo); A.113 (Rochester).

- 6 -

## II.     Primary's Insurance Program And Its Demand For Coverage

Primary sought coverage from Granite State for the Underlying Suits under a single commercial general liability ("CGL") insurance policy covering the period from April 6, 2022 to April 6, 2023, while noting with regard to the New York Action that "prior policies also may be implicated." A.18. Granite State issued eight additional CGL policies to Primary covering the policy periods from 2012 to 2015 and 2017 to 2022 (all nine CGL policies are referred to herein as the "Granite State Policies"). A.11-12. National Union issued eight umbrella liability insurance policies to Primary from 2013 to 2015 and 2017 to 2023 (collectively, the "National Union Policies"). A.12. Those policies potentially apply in excess of the Granite State Policies and have substantively identical coverage grants. A.12. We refer to the policies issued by Granite State and National Union collectively as the "Policies." Granite State and National Union both issued letters to Primary denying coverage under their respective Policies. A.18-19.

## III.    The Insurers' Coverage Lawsuits And District Court's Decision Finding There Is No Coverage For The Underlying Suits.

On August 29, 2023, the Insurers filed a Complaint against Primary seeking in Counts I and II a declaration that Granite State does not owe a duty to defend or indemnify Primary against the Underlying Suits under the Granite State Policies, and in Counts III and IV the same declaration under the National Union Policies. ROA.1 ¶¶ 46-63. On November 3, 2023, Primary filed its Answer, and asserted

Counterclaims for Breach of Contract (Count I), a Declaratory Judgment (Count II), and Bad Faith (Count III).  ROA.29 ¶¶ 16-31.

On December 13, 2023, the Insurers moved for summary judgment on Counts I and III of their Complaint and Counts I and II of Primary's Counterclaims—i.e., those Counts implicating the duty to defend.  A.218.  Primary opposed the Insurers' Motion and "cross-moved for partial summary judgment on whether Plaintiffs have breached their duty to defend as a matter of law and ... [for] the attorney fees it has incurred in defending the Insurers' declaratory judgment action."  A.223.

The Insurers argued they did not have a duty to defend for two independent reasons, both stemming from the Insuring Agreement in the Policies.  First, the Underlying Suits do not allege that the harm to the government plaintiffs was caused by an "Occurrence," defined as an "accident" in the Policies, a fundamental requirement for coverage to apply.  A.219.  Second, the Underlying Suits do not allege that the government plaintiffs seek to recover "damages because of 'bodily injury,'" a second and equally fundamental requirement for coverage to apply.  A.223.

On August 30, 2024, the District Court granted the Insurers' motion, holding that "[t]he Policies do not obligate Granite State or National Union to defend

- 8 -

Primary Arms in the Underlying Suits."[2]  A.224.  To reach its decision, the District Court first canvassed Texas law and concluded that, "[u]nder Texas law, a person's act is not an accident when (1) he commits an intentional act that (2) results in injuries that ordinarily follow from or could be reasonably anticipated from the intentional act.  [I]n this context, an intentional act and the intent to cause injury are two distinct concepts."  A.220 (quoting *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 329 (5th Cir. 2023)).

Then, the District Court held that "[t]he allegations [in the Underlying Suits] make clear that [Primary]'s alleged conduct was not an accident but instead comprised intentional acts that resulted in injuries that ordinarily follow from or could be reasonably anticipated from that act."  A.221 (cleaned up).  Put another way, "the Underlying Suits allege that [Primary] took deliberate action to enable the anonymous acquisition of uncontrolled firearms with the predictable outcome of increasing gun violence."  A.222.

---

[2] Although the District Court held that the Insurers do not owe a duty to defend under the nine Granite State Policies and eight National Union Policies, Primary's appeal pertains only to whether the Insurers owe a duty to defend under the six Granite State Policies and the six National Union Policies covering policy periods from July 4, 2017 to August 6, 2023.  (Primary Br. at 7.)  Accordingly, Primary concedes the Insurers do not owe a duty to defend under the three Granite State Policies that cover policy periods from April 6, 2012 to April 6, 2015, and the two National Union Policies that cover policy periods from April 6, 2013 to April 6, 2015.

In so doing, the District Court rejected Primary's argument that "claims sounding in negligence must allege 'occurrences.'" A.222. Quoting the Texas Supreme Court's decision in *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007), the District Court noted that, "[u]nder Texas law, 'a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly.'" A.222. But that was not the case here:

> The allegations in the Underlying Suits ... make clear that the failure to perform any checks regarding Defendant's customers was not a mistake, but rather a deliberate part of Defendant's business and marketing model in order to maximize sales. The claim is not that Defendant forgot to run a background check on certain customers or misplaced its paperwork; rather, the allegations are that Defendant made a deliberate choice not to implement internal controls. The expected result of not implementing controls is that individuals who are prohibited from owning firearms -- because their owning firearms poses an increased risk for societal harm -- can obtain firearms by purchasing Defendant's products.

A.222-23.

The District Court chose not to address the Insurers' damages-because-of-bodily-injury argument because it had already decided the "accident" issue in favor of the Insurers, which meant there was no duty to defend. A.223 n.2.[3]

---

[3] The District Court also denied Primary's cross-motion on the duty to defend, and the request for attorneys' fees that Primary included in its cross-motion, reasoning

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's judgment for two independent reasons.

First, the Underlying Suits do not allege harm caused by an "occurrence." A bedrock principle of insurance law is that insurance is intended to cover fortuitous events. Accordingly, general liability insurance policies are meant to cover only accidental harm; for example, injuries resulting from a slip and fall on Primary's premises, or from a defective firearm sold by Primary exploding in a user's hand. The Policies exemplify that commonsense coverage limitation by providing coverage only for damages caused by an "occurrence," defined in relevant part as an "accident." If there is no accident, there is no occurrence, and thus no coverage.

The District Court correctly concluded that was the case here. The Underlying Suits brim with allegations that Primary acted intentionally—time and again, they claim Primary intentionally avoided federal serialization and background check requirements and intentionally marketed its firearm products to individuals who could not legally possess firearms under federal law specifically as a way to avoid those requirements (and this Court must take those factual allegations as true, and examine them only against the relevant terms of the Policies, in assessing the duty

that "[b]ecause [the Insurers] are not obligated to defend in the Underlying Suits," Primary was not entitled to fees. A.223-24.

- 11 -

to defend). Under Texas law, intentional acts like Primary's do not cause harm by accident if the harm is "of a type that [would] 'ordinarily follow'" from the intentional act, regardless of whether the consequences were subjectively expected or intended by the insured. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 828 (Tex. 1997). Here, the District Court correctly held that increased gun violence and crime would ordinarily follow from Primary's deliberately seeking to put ghost guns into the hands of individuals deemed too dangerous to possess firearms under federal law.

Primary argues, however, that the two-part test for analyzing the accident requirement applied in *Cowan* does not apply to cases that, as here, involve the insured's sale of products. Instead, Primary urges, there is no accident alleged in such cases unless the insured is alleged to have subjectively expected or intended the alleged harm. Primary's argument for a separate "accident" test in cases involving the sale of products, however, has no support in the language of the Policies, and is premised on a fundamental misreading of Texas law. Indeed, none of the cases relied on by Primary articulate an alternative test or support the proposition that the *Cowan* test does not apply to cases involving the sale of products—rather, all of the cases relied on by Primary are consistent with both the *Cowan* test and the District Court's application of that test in this case.

Primary also argues repeatedly that the District Court made a policy judgment that ghost guns are dangerous, and that its opinion is inconsistent with federal law and Texas law on that ground. This too is wrong. The District Court did not apply its own policy views. Instead, it concluded that the Underlying Suits allege that Primary committed intentional acts with predictable results. Primary's arguments against that point are little more than assertions that it did not actually do what the Underlying Suits accuse it of doing. But, under Texas law, whether the plaintiffs can prove the allegations in the Underlying Suits is not relevant to the District Court's holding that the Underlying Suits do not *allege* harm caused by an accident.

If the Court agrees with the District Court's holding that the Underlying Suits do not allege harm caused by an accident, that is enough to affirm and this Court need not reach any other issue. However, in the event the Court disagrees with the District Court's holding on the "accident" issue, the Court may nonetheless affirm the District Court on the independent ground that the Underlying Suits do not satisfy a second threshold requirement to trigger coverage under the Policies.

To be covered under the terms of the Policies, the Underlying Suits must seek "damages because of 'bodily injury.'" If this Court addresses that issue, it should conclude that the Underlying Suits do not do so. A series of cases, most of which dealt with the opioid crisis, have confirmed that jurisdiction-wide, public-nuisance-type complaints like the ones at issue here do not allege "damages because of 'bodily

injury,'" even though there may be some bodily injury at their root, if they do not claim damages traceable to a specific, identifiable bodily injury or set of bodily injuries. *See, e.g.*, *ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022). Here, the plaintiffs in the Underlying Suits are governmental entities, not individuals that suffered bodily injury from ghost guns. They seek to recover increased expenditures from the public purse for jurisdiction-wide ills like the need for increased policing or additional resources to care for gunshot victims generally, without ever seeking to tie those damages to a specific injury. Under *ACE* and other cases like it, the Underlying Suits do not allege "damages because of 'bodily injury.'" Texas law is consistent with this outcome.

Lastly, this Court should not certify this case to the Texas Supreme Court as Primary requests. "Issues of state law are not to be routinely certified to the highest court of [a state] simply because a certification procedure is available." *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 370 (2d Cir. 1999). Here, the law of Texas is clear on the accident requirement, yet Primary seeks certification on that issue. Primary tries to obscure that clarity by claiming that Texas courts have never decided "completed operations coverage arising out of the sale of firearm products," Primary Br. at 28, but that is no more than misdirection. At bottom, new fact pattern or not, the question Primary seeks to certify is simply whether there is an "accident" here—a question that is already answered by settled law from the

Texas Supreme Court. And certification would have real costs here—specifically depriving the Insurers, who are diverse from Primary, of their constitutional entitlement to a federal forum for this dispute. *See 53rd St., LLC v. U.S. Bank N.A.*, 8 F.4th 74, 81 (2d Cir. 2021). This Court should deny Primary's request for certification and affirm the District Court.

## LEGAL STANDARD

The Insurers agree that Texas law applies and that the District Court's grant of summary judgment is subject to *de novo* review. *See* Primary Br. 12 (citing *Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 423 (2d Cir. 2002)).

## ARGUMENT

Under Texas law, courts apply the "eight-corners rule" to assess the existence of a duty to defend "based on (1) the pleadings against the insured and (2) the terms of the insurance policy." *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Co.*, 640 S.W.3d 195, 199 (Tex. 2022); *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006) (same). The parties agree that the "terms" of the Policies relevant to this appeal are found in the "**Insuring Agreement**," which provides as follows:

> We will pay those sums that the insured becomes legally obligated to pay as ***damages because of "bodily injury" or "property damage"*** to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. ***However, we will have no duty to defend the insured against any "suit"***

> ***seeking damages for "bodily injury" or "property damage" to which this insurance does not apply***. …
>
> ***This insurance applies*** to "bodily injury" and "property damage" ***only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence"*** ….

A.24 (emphasis added).)

The District Court correctly determined that the pleadings in the Underlying Suits do not allege that Granite State faces liability for bodily injury "caused by an 'occurrence'." A.219. In addition, the pleadings do not allege that Granite State faces liability for "damages because of 'bodily injury'." Although the District Court did not reach this second argument, *see* A.223, should this Court decide to do so, it provides an additional basis to affirm. *See Olson v. Major League Baseball*, 29 F.4th 59, 84 (2d Cir. 2022) (noting that this Court "may affirm on any ground supported by the record").

## I.   The Underlying Suits Do Not Allege Bodily Injury or Property Damage Caused By An Accident.

### A.   Under Texas Law, Harm That Ordinarily Follows From An Insured's Intentional Conduct Is Not Caused By An Accident.

"Fortuity is perhaps the most fundamental principle of insurance and insurance law." 16 Appleman *Insurance Law & Practice* § 116.1(B) (2000). Each of the Policies incorporates this fundamental principle by providing coverage to Primary for "damages because of 'bodily injury'" ***only*** when "the 'bodily injury' ... is caused by an 'occurrence,'" which is generally defined in the Policies as an

"accident." *See* A.24. Although the Policies do not define the term "accident," "courts generally agree that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen." 10 Couch on Insurance 3d § 139:14 (Nov. 2023). Texas law is in accord. As the Texas Supreme Court has explained, "[a]n accident is generally understood to be a fortuitous, unexpected, and unintended event." *Lamar Homes*, 242 S.W.3d at 8 (quoting 1A Appleman *Insurance Law & Practice* § 360 (1981)).

Under a long line of Texas cases, there is no fortuity, and thus no "accident" for insurance purposes, when the insured (i) engages in intentional conduct that (ii) results in harm that ordinarily flows from such conduct. *See, e.g.*, *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 555-56 (Tex. 1976); *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (1973); *Int'l Travelers' Ass'n v. Francis*, 23 S.W.2d 282, 284-85 (Tex. 1930). The leading case for this proposition is *Trinity Universal Insurance Co. v. Cowan*, 945 S.W.2d 819 (Tex. 1997).

Gage, the insured in *Cowan*, worked at a photography store, made illicit copies of intimate photographs of a woman, and showed them to his friends, all while claiming he never intended for the woman whose privacy he invaded to find out. *Id.* at 826. When the victim sued Gage, he sought insurance coverage, with the decision turning in part on whether intentional conduct that resulted in harm could be deemed

an "accident" for insurance coverage purposes. *Id.* Applying a subjective standard, the Texas Court of Appeals concluded that, although Gage had engaged in intentional conduct, there was no accident because Gage had not subjectively expected or intended to cause emotional distress. *Id.*

The Texas Supreme Court reversed. It held that the question whether an intentional act that resulted in harm could be an "accident" was evaluated not subjectively (i.e., whether the insured subjectively expected or intended the harm resulting from his intentional act) but rather objectively. The question to ask, the Texas Supreme Court held, was "whether the [insured] should have reasonably anticipated that his conduct would probably bring about the victim's injuries." *Id.* at 827.[4] In the case before it, "Gage's conduct was not an 'accident'" for insurance purposes "***because the injury to [the victim], the invasion of her privacy, is of a type that ordinarily follows from Gage's deliberate conduct***...." *Id.* at 828 (cleaned up) (emphasis added).

---

[4] *See also, e.g.*, *Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834, 837 (Tex. Ct. App. 1997) (when "determin[ing] whether certain conduct constitutes an 'accident' for purposes of insurance coverage," the "standard is objective. A person is held to intend the natural and probable results of his acts even if he did not subjectively intend or anticipate those consequences."); *Branham v. State Farm Lloyds*, No. 04-12-00190-CV, 2012 WL 3985925, at *3-5 (Tex. Ct. App. Sept. 12, 2012) (no accident and thus no occurrence where the insured deliberately concealed damage to a home she sold because a lawsuit stemming from the concealment was not a "fortuitous, unexpected, and unintended event").

This is a fundamentally straightforward concept: if an insured acts deliberately, then harm of a type that could be objectively expected to ordinarily follow from such deliberate conduct is not an accident. That concept, clearly set forth in *Cowan*, has been applied by the Texas Supreme Court and other courts in Texas numerous times since. *See, e.g.*, *Lamar Homes, Inc.*, 242 S.W.3d at 8; *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999).

The decision by the Fifth Circuit in *Blue Bell* is *Cowan*'s most prominent, recent application. In *Blue Bell*, a lawsuit alleged that insured directors and officers "knew that Blue Bell's manufacturing plants had repeatedly and consistently tested positive for Listeria contamination, yet they continued to manufacture and distribute ice cream products in conscious disregard of the known risks." *Blue Bell*, 73 F.4th at 326. That resulted (predictably) in an outbreak, which caused "substantial financial loss"; the directors and officers sought coverage for suits seeking damages because of that loss. *Id.* at 325.

Correctly applying *Cowan* and its progeny, the Fifth Circuit held that "the alleged injuries were not caused by an 'accident.'" *Id.* at 329-330. "[A]s alleged in the shareholder complaint, the breach of fiduciary duties stemmed from intentional acts, and the Listeria outbreak and the resulting financial harm were natural and probable consequences that could be reasonably anticipated" to follow from that intentional conduct. *Id.* at 330. Therefore, as made clear in *Cowan* and other Texas

Supreme Court cases, and as applied most recently in *Blue Bell*, when an insured faces liability for the "natural and probable consequences" of its "intentional acts," there is no "accident" triggering insurance coverage. *Cowan*, 945 S.W.2d at 828. The District Court did not err in applying that well-settled Texas law to this dispute.

###### B. Primary's Efforts To Escape *Cowan* Fail.

Primary argues, correctly, that the District Court's "Opinion chiefly relies on the Fifth Circuit's decision in [*Blue Bell*] ... which applied an 'occurrence' analysis that focused on whether the policyholder's actions were 'voluntary'—not whether the resulting injuries were expected or intended." Primary Br. at 21. Primary fails to mention, however, that the Fifth Circuit's decision in *Blue Bell* relied on, and extensively quoted from, the Texas Supreme Court's decision in *Cowan*. Indeed, Primary fails to even mention *Cowan* in its brief, and certainly does not argue that the District Court incorrectly applied the holding of that case.

Primary argues instead that "the rubric in *Blue Bell*"—that is, *Cowan's* two-part test for analyzing the accident requirement—"does not apply here for two separate and distinct reasons." *Id.* "First and foremost," according to Primary, "the 'occurrence' analysis in *Blue Bell* is not the analysis applicable to products-completed operation coverage." *Id.* at 22. Instead, citing *Zurich American Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487 (Tex. 2008), Primary asserts that "the applicable 'occurrence' analysis is whether the Underlying [Suits] allege that Primary Arms

necessarily **expected or intended** the alleged injuries from the sale of its firearm products, not whether its act of selling firearm products was voluntary or intentional." Primary Br. at 22 (emphasis added).

Primary's conception of the impact of the products-completed operations hazard ("PCOH") coverage in the Policies is fundamentally misguided. The only references in the Policies to PCOH are in the definitions section, where it is defined to "[i]nclude all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of your product," *see* Primary Br. at 9 (quoting A.192-97), and on the Declarations pages, which provide a separate aggregate limit of liability for "products-completed operations" claims, A.28. The Policies do not even remotely suggest that the fundamental "accident" requirement set forth in the Insuring Agreement in the Policies does not apply to PCOH coverage.

The fallacy of Primary's PCOH argument is also readily apparent from the facts of *Blue Bell*. In *Blue Bell* the Fifth Circuit applied *Cowan* to determine that there was no accident in **a suit over the sales of a product**—the Listeria-ridden ice cream that Blue Bell's directors and officers deliberately allowed to be sold. *Blue Bell*, 73 F.4th at 326. Thus, the "accident" requirement still exists, and *Cowan* still applies, even in cases dealing with the insured's sales of products; that is, fortuity remains a fundamental principle of insurance law whether the insured is distributing lewd photographs or selling products.

Nor is Primary correct that *Nokia* suggests a different "accident" standard applies in products cases, *see* Primary Br. at 22; indeed, *Nokia* is ***not*** an "occurrence" case at all. Instead, the question before the Texas Supreme Court was whether Nokia, the insured, faced liability for "damages because of 'bodily injury'." *Nokia*, 268 S.W.3d at 495-96. The Texas Supreme Court answered the damages-because-of-bodily-injury question by assessing whether the allegations in each underlying complaint (there were multiple at issue) "include[d] at least one theory under which tort damages could be recovered." *Id.* at 495. Because each complaint did, the "damages because of bodily injury" component of the insuring agreement in the insurance policies at issue was satisfied. *Id.*

*Nokia*, however, made no mention of the two-part "accident" test applied in *Cowan*, nor did it suggest that the *Cowan* test does not apply to PCOH claims. To the extent *Nokia* dealt with the issue of fortuity at all, it did so only in passing and in connection with its discussion of the damages-because-of-bodily-injury requirement. *See id.* It is difficult to understand why Primary relies so heavily on what essentially amounts to dicta to argue that the District Court erred in its analysis of the "accident" question.

Regardless, the portion of *Nokia* that Primary cites is consistent with the Texas Supreme Court's analysis in *Cowan*, and fully consistent with the District Court's analysis in this case. In *Nokia*, the plaintiffs in the underlying lawsuits claimed they

had been injured by "radio-frequency radiation" ("RFR") emitted by cell phones. *Id.* at 489. As noted, the Texas Supreme Court assessed whether those lawsuits alleged damages because of bodily injury. *Id.* at 491-98. In the course of examining that issue, it noted that "[t]he pleadings allege both intentional conduct (Nokia knew of RFR's harmful effects and nonetheless intentionally sold its products to consumers) and negligence (Nokia should have known of RFR's harmful effects)." *Id.* at 495. Because the latter allegations allowed for the possibility that Nokia would be found liable for true negligence—i.e., unwittingly selling defective phones—there was a possibility of coverage and therefore a duty to defend. *Id.*

Contrary to Primary's argument, however, the *Nokia* court **did not hold**—or even suggest—that the applicable 'occurrence' analysis in PCOH cases is whether the insured subjectively ***expected or intended the injuries*** that resulted from the sale of its products. In fact, *Nokia* does not even contain the words "expected or intended."[5] *Id.*

---

[5] Nor would an "expected or intended" test for the "accident" requirement make sense. Insurance policies first require the insured to establish coverage—including by establishing that the harm for which the insured faces liability was caused by an "accident." *E.g.*, A.28. To the extent coverage is established, an insurer may then rely on exclusions in a policy, which narrow the coverage that is otherwise available. Many policies (including the ones at issue here) contain an exclusion for bodily injury or property damage expected or intended by the insured. But it would make no sense to exclude from coverage expected or intended injury if, as Primary now asserts, the term "accident" already establishes there is no coverage for such harm. As the Fifth Circuit explained, "the 'occurrence'/'accident' analysis is meaningfully different from the exclusion for 'expected or intended' injuries. Under

To be clear, the Insurers do not dispute that the Policies cover all sorts of general liability—slips and falls on Primary's premises, say. And they also cover liability resulting from Primary's defective products; for example, if Primary were to sell a defective frame or receiver that blew up in a user's hand. But, unlike *Nokia* (which was not just a products case, but a ***defective*** products case), the Underlying Suits are not typical products liability cases where a defective product, sold by an insured unaware of the defect, injures an end user. Instead, Primary is accused of deliberately marketing and selling its firearms products—which worked precisely as intended, and were not defective in any sense—to dangerous individuals, who then allegedly used those (properly functioning) ghost guns to wreak havoc. *Nokia* is inapposite.

The "second" basis on which Primary argues that *Blue Bell*, and thus *Cowan*, does not apply here is that, according to Primary, "*Blue Bell* reflects a 'dichotomy' in the occurrence analysis between the Texas cases that allege solely intentionally harmful conduct (the so-called '*Maupin*' line of cases) versus cases that allege negligent conduct (the so-called '*Orkin*' line of cases)." Primary Br. at 22-23 (citing *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999)). But rather than establish *Cowan*'s inapplicability, *Federated*, like the other

---

Texas law, whether the insured 'expect[s] or intend[s]' [the injury] is of no consequence to our determination of whether his actions were an 'accident.'" *Blue Bell*, 73 F.4th at 331 (quoting *Cowan*, 945 S.W.2d at 827-28).

cases Primary cites, is consistent with the District Court's determination that the alleged harm resulting from Primary's marketing and sale of ghost guns was not caused by an accident.

The "*Maupin*" identified in *Federated* is *Argonaut Southwest Insurance Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973). In that case, Maupin Construction Company removed 5,744 cubic yards of "borrow material" for roadway fill from a property in Austin, Texas. *Maupin*, 500 S.W.2d at 633-34. The Texas Supreme Court found that "[t]he removal of over 5,000 cubic yards of borrow material from the Meyers' property by [Maupin] was intentional and deliberate" and "did not constitute an accident." *Id.* at 635. As the court explained, Maupin, the insured, "did exactly what they intended to do.... The fact that they were unaware of the true owner of the property has no bearing upon whether the trespass was caused by accident. The [insured's] acts were voluntary and intentional, even though the result or injury may have been [subjectively] unexpected, unforeseen and unintended" by Maupin, *id.*; there was no negligent performance of the intentional act, and thus no accident.

In *Massachusetts Bonding & Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex. 1967), the employees of the insured, Orkin, attempted to eradicate pests that were causing damage to milled rice owned by Gulf Coast Rice Mills by blowing dust containing an insecticide into a warehouse. The dust settled on sacks

containing rice, and small amounts of the insecticide sifted through the sacks onto the rice, which resulted in a substantial loss to Gulf Coast. *See id.* at 397. The insurer denied coverage, asserting "that the application of [the dust] was not an 'accident' within the coverage of the policy...." *Id.* at 398. The Texas Supreme Court disagreed. While Orkin intentionally applied the dust in the warehouse, it did not intentionally apply the insecticide to the sacks of rice in the warehouse. *Id.* at 397. According to the Texas Supreme Court, therefore, Orkin's faulty workmanship was an accident for insurance purposes: "We construe the term 'accident' as used in the policy to include negligent acts of the insured causing damage which is undesigned and unexpected." *Id.* at 400.

As discussed in detail below, *see infra* at 27-36, the allegations against Primary in the Underlying Suits are not that it negligently shipped a defective product, or that the harm it caused was the result of negligent or faulty workmanship. Thus, *Orkin* and any "*Orkin* line of cases," such as *Nokia*, do not apply here. Instead, as was the case with the insured in *Maupin*, Primary did exactly what it allegedly intended to do—market and sell ghost guns as a way to avoid gun laws. That is, Primary's alleged conduct was voluntary and intentional, even though it now contends that the resulting harm was subjectively unexpected and unintended. And that is true with regard to *Cowan* as well; the insured there made copies of the

victim's photos and distributed them just as he intended to do, even though he claimed he did not intend to cause harm. 945 S.W.2d at 826-27.

As the Texas Supreme Court held in *Maupin* and *Cowan*, as the Fifth Circuit held in *Blue Bell*, and as the District Court held here, intentional conduct that results in harm that ordinarily follows from such conduct is not transformed into an accident for insurance purposes simply because the insured claims it did not subjectively expect or intend to cause the harm. Thus, whether or not there is a "dichotomy" as Primary claims, the Fifth Circuit's decision in *Federated* does not establish the District Court's reliance on *Blue Bell* was in error.

### C. The Underlying Suits Allege Harms That Would Ordinarily Follow From Primary's Intentional Conduct.

As noted above, the "eight-corners rule" requires the Court to consider the factual allegations in the pleadings in the Underlying Suits to determine whether (1) Primary is alleged to have engaged in intentional conduct, that (2) resulted in harm that ordinarily follows from such conduct. The District Court correctly determined that the liability faced by Primary is ***not*** for harm caused by an accident.

#### 1. *The Underlying Suits Allege Intentional Conduct By Primary.*

Before analyzing the pleadings to determine whether Primary faces liability for intentional conduct, it is helpful to concretize that requirement because it is often misunderstood. A suit against someone who, for example, accidentally drops a gun

that then fires and hits someone in a nearby crowd would not allege deliberate or intentional conduct that led to harm. But a suit against someone who is alleged to have deliberately or intentionally fired a gun into a bar in an attempt to silence the jukebox, but who instead shot a person at the bar whom he did not intend to injure, would still allege intentional conduct, even though there was no subjective intent to injure.

Put another way, the "intentional conduct" question—part one of the *Cowan* test—is concerned with the nature of the insured's act, not the subjective understanding that the act may lead to specific consequences. The first question here is whether Primary's alleged conduct in the Underlying Suits fits into the first category (unintentional acts) or the second one (intentional acts), regardless of whether Primary had any intent to cause the harm that resulted from that conduct.

The District Court held that the pleadings in the Underlying Suits allege that Primary faces liability solely for intentional conduct. *See* A.221. And the Insurers do not argue, and the District Court did not determine, that Primary's intentional conduct was the mere "voluntary or intentional" sale of its "firearm products," as Primary contends. *Contra* Primary Br. at 10. Instead, the District Court correctly concluded that Primary is alleged to have engaged in far more troubling intentional conduct; among the factual allegations the District Court cited are the following:

- "[d]espite the illegality of their conduct, each [d]efendant has intentionally and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York";

- "[d]efendants specifically market the unfinished frames and receivers as designed to evade federal gun laws";

- "[e]ach [d]efendant intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training"; and

- "[d]efendants here have done and continue to do nothing to geographically restrain the marketing of their prohibited products, and they employ policies and practices that result in sales of these illegal products directly to unknown and deliberately unchecked individuals in New York."

A.221.

These are just examples of the factual allegations in the Underlying Suits detailing the intentional conduct for which Primary faces liability, and the Insurers urge the Court to read those complaints in their entirety. As discussed above, the complaints in the Underlying Suits repeatedly allege that Primary intentionally shipped ghost gun kits into New York, that it deliberately evaded federal licensing and serialization requirements, and that it deliberately marketed its products as designed to evade such requirements. *Supra* at 3-5. As the District Court stated, "the Underlying Suits allege that Defendant took **deliberate** action to enable the anonymous acquisition of uncontrolled firearms." A.222 (emphasis added); *see also* A.222-23 ("The claim is not that Defendant forgot to run a background check on

certain customers or misplaced its paperwork; rather, the allegations are that Defendant made a ***deliberate*** choice not to implement internal controls.") (emphasis added).

Primary disagrees that the Underlying Suits allege only that it engaged in intentional conduct. In support of its position, Primary relies almost exclusively on a single sentence in the 635-paragraph complaint in the New York Action: an allegation that "Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety." *See* A.157. The weight that Primary places on that statement is evident from its repetition throughout its brief; indeed, Primary frames its Statement of the Issue around that quote, *see* Primary Br. at 1, and then repeats it nine times throughout the brief. *See id.* at 2, 5, 13, 14, 16, 26, 29.

However, that single, conclusory statement fails to establish that the Underlying Suits allege that Primary engaged non-deliberate conduct. Texas courts are clear that stray allegations like the one Primary cites, or even causes of action sounding in negligence, cannot transform a complaint that contains only factual allegations of intentional conduct into one that alleges non-intentional conduct as well. *See, e.g.*, *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82-83 (Tex. 1997) ("Thus, although [plaintiff] seeks relief on legal theories of negligence and gross negligence, he alleged facts indicating that the origin of his damages was intentional behavior. He made no factual contention that could constitute negligent

behavior by [insured].”); *Katerndahl v. State Farm Fire & Cas. Co.*, 961 S.W.2d 518, 522 (Tex. Ct. App. 1997) (no duty to defend complaint alleging negligence and “gross negligence” because “the eight corners rule mandates that we look to the facts pled and not to causes of action alleged in determining coverage,” and “the facts pled in this case implicate only intentional acts”); *cf. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines*, 939 S.W.2d 139, 141 (Tex. 1997) (“However ... in reviewing the underlying pleadings, the court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged.” (citations omitted)).

The same is true here. One spurious, boiler-plate mention of acting “negligently” in a lengthy complaint that otherwise alleges only intentional conduct by Primary cannot turn that intentional conduct into non-intentional conduct. Primary is not alleged to have somehow accidentally shipped thousands of firearm products to New York when it meant to ship them to, say, Wyoming; and it is not alleged to have somehow mistakenly believed that background checks and serializations were unnecessary for firearms. Instead, it is alleged to have consciously chosen to ship unfinished frames and receivers to New York, refrained from subjecting those firearms to serialization and background check requirements,

and marketed its firearms products as a means to avoid those same requirements. That is quintessentially intentional conduct.[6]

Similarly, Primary criticizes the District Court for reading the pleadings "***as a whole***," and purportedly focusing on "critical allegations," Primary Br. at 16-17 (quoting A.221-22, with added emphasis); instead, Primary says, the District Court should have looked for "***any*** allegations that 'potentially support a covered claim,'" *id.* at 17 (quoting *Nokia*, 268 S.W.3d at 489, with added emphasis). But the District Court was required under Texas law to read the complaints in the Underlying Suits as a whole to determine whether there was a potentially covered claim. It had to assess the entirety of the factual allegations in the complaints, rather than rely on a single conclusory allegation of negligence or a label on a cause of action. *See, e.g.*, *Griffin*, 955 S.W.2d at 82-83. The District Court did not err in following Texas law in that regard.

As to the "critical allegations" point, Primary simply misquotes the District Court. Before the District Court, Primary claimed that only the allegations that

---

[6] Primary also alludes to an argument that allegations that it "should have known" what it was doing suffice to make its conduct accidental. *E.g.*, Primary Br. at 13, 16. But it never actually cites any occasion where the Underlying Suits made such an allegation. *Id.* And even if Primary had cited such an occasion, it would make no difference. *E.g.*, *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 738 (Tex. Ct. App. 1996) (allegations that insured "should have known" a property suffered from flooding but concealed the flooding nonetheless did not allege an accident where "[a]ll of the … allegations revolve around … alleged intentional acts").

mentioned it by name—as opposed to allegations made against "Defendants" or "each Defendant"—mattered for a duty-to-defend analysis.  ROA.42, p. 8.  The District Court responded to that argument by stating that "***Defendant's effort to exclude critical allegations in the Complaint are unavailing***."  A.221 (emphasis added).  Plainly, that is not a statement by the District Court that it intended to rely solely on such allegations; it instead criticized Primary for fallaciously seeking to ignore such allegations.

Primary further complains that the key allegations upon which the District Court relied "are mostly iterations of a disputed legal premise—to wit, that the sale of unfinished frames and receivers without background checks was 'illegal,' 'prohibited,' or otherwise regulated by federal gun laws in the first instance." Primary Br. at 17-18.  Along the same lines, Primary asserts that the District Court "concludes there is no coverage because Primary Arms' shipments were allegedly made 'after [New York City's] ban on unfinished frames and receivers'" in February 2020, and suggests that this purported rationale does not support a holding that the Underlying Suits do not allege an accident as to Policies that pre-date the ban.[7] Primary Br. at 19-20.

---

[7] Although the alleged illegality of Primary's conduct was not necessary to the District Court's holding, it is worth noting that the allegations of illegal conduct cited by the District Court relate to several federal, state, and local laws, not just the referenced New York City ban of unfinished frames and receivers in February 2020. A.40.

But Primary is simply wrong that the District Court's holding—or the Insurers' arguments—depend on the alleged illegality of Primary's conduct. Rather, the District Court cited those particular allegations to emphasize that the Underlying Suits accuse Primary of acting ***intentionally***, which is the relevant issue under the first prong of *Cowan*. A.221-22. The factual allegations challenged by Primary were part of a litany cited by the District Court, not for the premise that the Underlying Suits allege Primary acted illegally, but because they allege Primary "took ***deliberate*** action to enable the anonymous acquisition of uncontrolled firearms with the predictable outcome of increasing gun violence." A.222 (emphasis added).

Further, even if the District Court was focused on whether the Underlying Suits alleged that Primary engaged in illegal, prohibited conduct (and, to be clear, it was not), it could not have erred by taking the allegations of illegality as true. Under Texas law, a court evaluating the duty to defend ***must*** take the allegations in an underlying complaint as true. *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 24 (Tex. 1965). Thus, Primary's arguments about the supposed legality of its conduct have no relevance.[8]

---

[8] It is worth noting, however, that the Supreme Court of the United States recently concluded in *Bondi v. VanDerStok*, No. 23-852, 2025 WL 906503 (Mar. 26, 2025), that various ATF regulations reaffirming that ghost guns were subject to background check and serialization requirements were not facially invalid. In so doing, it reversed the Fifth Circuit's decision in *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023), which Primary cites to support the idea that its actions were not illegal. Primary Br. at 18, 24. So even if this Court were to evaluate the truth or falsity of

\*    \*    \*

Besides *Nokia*, the case that Primary cites most extensively is *Lamar Homes*. That case supports the Insurers.  It involved "allegations of unintended construction defects" that resulted from faulty work by a subcontractor.  242 S.W.3d at 4.  The insurer argued that "faulty workmanship is not an accident because injury to the general contractor's work is the expected and foreseeable consequence" of a subcontractor's errors.  *Id.* at 8.  The Texas Supreme Court disagreed, instead concluding that "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly."  *Id.*

That final clause is the answer to all of Primary's arguments concerning whether it acted intentionally or unintentionally.  The deliberate acts that Primary allegedly performed were, among other things, to ship its products to New York, to ignore federal serialization and background check requirements, and to market its products as workarounds to those requirements.  But Primary is not alleged to have performed those acts negligently—it did not allegedly ship products to the wrong state; it did not allegedly forget about serialization and background check requirements; and it is not alleged to have somehow accidentally run the wrong

---

the allegations in the Underlying Complaints (which, as discussed above, Texas law firmly prohibits), Primary's arguments would still fail.

marketing copy for its products. Rather, Primary allegedly performed its deliberate acts "**correctly**," as the Texas Supreme Court put it in *Lamar Homes*. *Id.* (emphasis added). Thus, unlike in *Lamar Homes*, there are no allegations of intentional conduct performed negligently here, and the District Court was right to conclude that Primary's potential liability stems exclusively from alleged deliberate acts.[9]

## 2. *The Harm Alleged In The Underlying Suits Is Harm That Ordinarily Follows From Primary's Intentional Actions.*

To be clear, and as discussed above, intentional conduct by the insured is just the first part of the two-part test in *Cowan*; that is, even intentional conduct can be an "accident" for insurance purposes. But, under the second part of the *Cowan* test, if Primary faces liability in the Underlying Suits for harm that would be objectively expected to ordinarily flow from its intentional conduct, then there is no "accident" and the Insurers have no obligation to defend Primary.

The District Court held that was the case. "Considering the allegations about who seeks out ghost guns and what happens when they do," the District Court said, "the Underlying Suits allege that [Primary] took deliberate action to enable the anonymous acquisition of uncontrolled firearms with the predictable outcome of

---

[9] Primary also briefly mentions another statement from *Lamar Homes*—that foreseeability of harm cannot be the boundary "between accidental and intentional conduct." Primary Br. at 20 (quoting *Lamar Homes*, 242 S.W.3d at 8). The Insurers agree. The question here is whether the harm that Primary allegedly caused is "of a type that [would] ordinarily follow" from its intentional actions. *Cowan*, 945 S.W.2d at 828. That is a different standard than mere foreseeability.

increasing gun violence." A.222 (emphasis added). Put another way, "[t]he expected result of not implementing controls is that individuals who are prohibited from owning firearms -- because their owning firearms poses an increased risk for societal harm -- can obtain firearms by purchasing Defendant's products." A.223.

The allegations in the Underlying Suits are that Primary deliberately marketed its unfinished frames and receivers to individuals who are prohibited by federal law from receiving firearms *precisely because they pose a high risk of using those firearms for violent purposes*. Thus, the harms complained of in the Underlying Suits—"an influx of ghost guns into New York" that is "a significant threat to public health and safety"; an increase in "the number of firearms likely to be used in the commission of a crime"; an increase in "the number of murders and suicides"; and the creation of "a new primary and secondary market for illicit guns in New York," A.59—would objectively be expected to ordinarily flow from Primary's alleged deliberate conduct.

Primary's arguments against this point again fail to convince. *First*, and in passing, it claims that "while the *sales* of these firearm products were intentional, there are no allegations in the Underlying Suits that *resulting injury and damage* ... *was expected or intended*." Primary Br. at 14 (emphasis added). But that is not the standard; as discussed above, the question is whether the resulting damage could reasonably have been anticipated, and of course it could have. *See Blue Bell*, 73

F.4th at 331 ("Under Texas law, whether the insured 'expect[s] or intend[s]' [the injury] is of no consequence to our determination of whether his actions were an 'accident.'" (quoting *Cowan*, 945 S.W.2d at 827-28)).

*Second*, Primary claims (at greater length) that the District Court's ruling "reflects a normative analysis by the Southern District of New York that the selling of unfinished frames and receivers without conducting a background check is intentionally harmful conduct," and that a Texas court would not view it as such. Primary Br. at 23. To support this point, it cites the Fifth Circuit's opinion in *VanDerStok* (since reversed by the Supreme Court, *see supra* at 34-35 n.8), as well as a Texas Supreme Court decision, *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021), where that court held that "a firearms retailer has [no] duty to protect others from the sale of their [sic] products," Primary Br. at 23-26.

That is wrong thrice over. To begin, Primary errs in saying that the District Court concluded that Primary's conduct was "intentionally harmful"; instead, and as discussed above, the question the District Court answered was whether the harms alleged in the Underlying Suits could have been reasonably anticipated to result from Primary's alleged deliberate conduct. *See supra* at 8-10; *Cowan*, 945 S.W.2d at 827. It did not make a "normative" assessment that Primary intended the harm it allegedly caused. Indeed, it did not make a normative assessment at all. Rather, the District

Court simply examined the allegations in the Underlying Suits, which must be taken as true for the purpose of the duty to defend analysis. *Supra* at 34.

Further, what Primary is really arguing here (again) is that the allegations in the Underlying Suits against it are false, or at least should fail. That is why it spends more than a full page of its brief block-quoting the since-reversed *VanDerStok* opinion's paean to at-home gunsmithing and emphasizes a Texas Supreme Court case that (read the way Primary wants it) might call into question some of the theories of liability in the Underlying Suits. Primary Br. at 23-26. But, as discussed above, ***Primary's view of the veracity and likelihood of success of the allegations in the Underlying Suits is irrelevant to a duty-to-defend analysis***. Texas law requires that the allegations be accepted as true. *See Heyden Newport*, 387 S.W.2d at 24. So even if Primary were correct that the District Court had made a normative assessment that Primary's conduct was intentionally harmful, and even if Primary were correct that a Texas court would view things differently, it still would not make a difference.

And, finally, since Primary was alleged to have acted illegally by shipping ghost guns ***into New York***, and was alleged to have violated federal law in addition to state law, what is legal in Texas in terms of selling firearms products is beside the point.

\* \* \*

- 39 -

In sum, the District Court correctly held that the factual allegations of the Underlying Suits describe only intentional conduct on the part of Primary, and only harm that would ordinarily follow from such conduct. Thus, under well-settled Texas law, the Underlying Suits do not allege harm caused by an accident and, therefore, do not trigger a duty to defend under the Policies.

## II. The Underlying Suits Do Not Allege "Damages Because Of 'Bodily Injury.'"

While this Court need not reach this argument if it affirms the District Court on the first issue, this Court could nevertheless affirm the District Court for a second, independent reason: the Underlying Suits do not seek "damages *because of* 'bodily injury,'" as is required by the Policies. *See supra* at 15-16 (emphasis added). While the District Court did not rule on the "damages because of 'bodily injury'" issue because it concluded there was no occurrence alleged, A.223, this Court "may affirm on any ground supported by the record." *Olson*, 29 F.4th at 84.

### A. Under The Consensus View, There Can Be No "Damages Because Of 'Bodily Injury'" Without Specific, Identifiable Injuries To Specific, Identifiable Individuals, Which The Underlying Suits Lack.

In recent years, the highest courts of various States, as well as the Sixth Circuit, have coalesced around a clear requirement for deeming a given lawsuit to seek "damages because of 'bodily injury'"—any monetary remedies sought must be a measure of the specific costs that have been paid to remediate specific, past bodily

injuries to specific, identified individuals.  For example, in *ACE American Insurance Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022), the Delaware Supreme Court held that two Ohio counties seeking to hold opioid dispensers responsible for the future costs of abating a public nuisance created by the opioid crisis were not seeking "damages because of" bodily injury, even though their economic injury may not have occurred but for the bodily injury:

> [T]he Counties' claims stem from a particular action—Rite Aid's negligent distribution of opioids to the public. This claim is not directed to an individual injury but to a public health crisis.  It is analogous to a city suing an insured soda distributor for increasing its citizens' obesity rates.  The city might claim costs for expanding its parks and recreational activities to address weight gain or increased public hospital expenditures for treating the population ... [b]ut these economic claims would not stem from any individual injury.  In other words, the city would not be bringing a personal injury claim or one for derivative loss, but rather a direct claim for its own aggregate economic injury.

*Id*. at 252-53; *see also Acuity v. Masters Pharmaceutical, Inc.*, 205 N.E.3d 460, 468 (Ohio 2022) (the government entity plaintiffs were seeking "damages for their own aggregate economic injuries caused by the opioid epidemic" which, though they may not have occurred "but for" the alleged bodily injury to their citizens, were not "damages because of" bodily injury because they were not meant to be a measure of the costs to address any specific bodily injury).

- 41 -

More recently, the Sixth Circuit rejected an insured's argument that the damages sought by government entities to address the opioid crisis were "because of bodily injury" because they would not have occurred "but for" bodily injuries caused by opioid abuse. *See Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 562 (6th Cir. 2023). Instead, it held that "purely economic damages" for the future abatement of a public nuisance are not "damages because of" bodily injury. *Id.*; *see also id.* at 563 (concluding that underlying damages are not because of bodily injury "where the underlying plaintiffs seek economic damages not to compensate an explicitly covered injury, but rather to cover the costs of activities conducted in relation to many indeterminate injuries").

And, finally, in *Blue Bell*, the Fifth Circuit—applying Texas law—concluded that the underlying complaint against Blue Bell's officers and directors for allowing a Listeria outbreak also did not allege damages because of bodily injury. It was true, the Fifth Circuit conceded, that "the 'damages contemplated by the [shareholder lawsuit] are factually attributable to bodily injuries suffered by Blue Bell customers.'" *Blue Bell*, 73 F.4th at 332 (quoting the insured's brief). But, citing many of the cases above, the Fifth Circuit concluded that factual attribution was not enough. "The shareholder complaint seeks damages to compensate for Blue Bell's economic loss caused by its directors' and officers' breach of fiduciary duties. It

does not seek to recover any damages on behalf of customers who may have suffered 'bodily injury' from the *Lysteria* [sic] outbreak." *Id.* at 334.

There is no clear case law from the Texas Supreme Court on this issue, but that need not be an obstacle.[10] Courts applying Texas law seek to harmonize their interpretations of insurance policies with those of other courts that have interpreted similar policy provisions. *See Cowan*, 945 S.W.2d at 824 ("[W]hen identical insurance provisions will necessarily be interpreted in various jurisdictions, we think it prudent to strive for uniformity as much as possible."). There is little doubt, then, that a Texas court would side with the *ACE*, *Acuity*, *Quest*, and *Blue Bell* consensus if such an issue were presented to it. Like the policies at issue in those cases, the Policies here require that any damages claimed be "because of 'bodily injury'" or property damage. A.24. But, like the underlying government plaintiffs in *ACE*, *Acuity*, and *Quest*, the government plaintiffs in the Underlying Suits seek generalized costs for programs needed to abate the public nuisance that Primary and its codefendants allegedly caused.

New York, for example, seeks:

---

[10] To the Insurers' knowledge, the only case in which the Texas Supreme Court examined the meaning of the phrase "damages because of bodily injury" was *Nokia*. 268 S.W.3d at 492-93. But it focused purely on whether alleged damages at the cellular level from cell-phone-emitted radiation actually constitute physical injury to the body, *see id.*, which is irrelevant here. Regardless, the underlying plaintiffs in *Nokia* were those allegedly injured; here, the plaintiffs in the Underlying Suits are governmental entities who (obviously) could not suffer bodily injury.

extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy unfinished frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard-hit by gun violence and crimes.

A.46. New York further alleges that it seeks to recover costs necessary to:

(i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

A.59; *accord* A.87-88 (Buffalo); A.113 (Rochester).  Those costs are what New York, Rochester, and Buffalo seek to recover "for [the jurisdictions'] own aggregate economic injury," *ACE*, 270 A.3d at 252-53; or "damages for their own aggregate economic injuries caused by" the actions of Primary, *Acuity*, 205 N.E.3d at 468; or "damages to compensate for [the plaintiffs'] economic loss caused by" the actions of Primary, *Blue Bell*, 73 F.4th at 334.  None of those alleged damages are traceable to, or seek to compensate, injuries to specific, identifiable individuals.  Therefore, under the consensus view they are not "damages because of 'bodily injury.'"

### B. The Counterarguments That Primary Made Before The District Court Are Unconvincing.

The Insurers presented the arguments above to the District Court, and Primary had the chance to offer counterarguments. None of those counterarguments should convince this Court.

*H.D. Smith*: Much of Primary's argument before the District Court relied on the Seventh Circuit's discredited decision in *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771 (7th Cir. 2016). In that case, the Seventh Circuit concluded that, under Illinois law, a lawsuit brought by the State of West Virginia seeking compensation for opioid-related, public-nuisance-style injuries sought "damages because of 'bodily injury.'" *Id.* at 773. The primary rationale for that decision was an underdeveloped and underexplained conclusion that West Virginia was in an identical position as a mother seeking to recover for costs she incurred caring for a sick child. *Id.* But that analogy is obviously flawed; as the Sixth Circuit, for example, pointed out, "the mother in *H.D. Smith*'s analogy still would have to prove the existence of her child's injuries to recover her caregiving costs, while the underlying plaintiffs here do not." *Quest*, 57 F.4th at 564. The same is true here; the plaintiffs in the Underlying Suits do not need to prove an injury to a single specific person to collect their public-nuisance-type damages. Primary also quoted *H.D. Smith* to claim that the consensus decisions are "untethered" to policy language. ROA.42 p.17. But that is simply wrong; even the briefest glance at those

- 45 -

cases would reveal that they carefully considered the policy language in making their decisions. *See, e.g.*, *Acuity*, 205 N.E.3d at 472 (examining the precise meaning of the phrase "because of").

**"For care"**: Primary also claimed that the Underlying Suits seek damages "for care," which meant, in Primary's view, that they seek "damages because of 'bodily injury.'" ROA.42 pp. 18-19. This too is wrong. The *ACE* court explained why: "Although some of those costs [sought in the underlying lawsuits] involve medical care, when an organization seeks to recover its costs incurred in caring for bodily injury, it must show that it treated an individual with an injury, how much that treatment cost, and that the injury was caused by the insured." 270 A.3d at 252 (footnote omitted). And in the opioid lawsuits, as in the Underlying Suits here, the "claim is not directed to an individual injury but to a public health crisis, ... [and the] [plaintiff is] not ... bringing a personal injury claim or one for derivative loss, but rather a direct claim for its own aggregate economic injury." *Id.* at 253; *see also, e.g.*, *Acuity*, 205 N.E.3d at 468-69. Put another way, the fact that a claim might include some costs of care in the aggregate does not render it a claim for "damages because of 'bodily injury'" within the meaning of the Policies.

**Texas law**: Primary also contended before the District Court that, under Texas law, the phrase "because of 'bodily injury'" is ambiguous, and ambiguous terms in insurance policies are construed in favor of the policyholder. ROA.42 pp.

- 46 -

17-18). But the only case it cited to support that contention, *Brainard v. Trinity Universal Co.*, 216 S.W.3d 809, 813 (Tex. 2006), addressed that phrase in determining "whether uninsured/underinsured motorist (UIM) insurance covers prejudgment interest that the underinsured motorist would owe the insured in tort liability." *Id.* at 811. To state the obvious, whether or not the phrase "because of 'bodily injury'" is ambiguous in that specific context has nothing to do with whether it is ambiguous here. Indeed, the *Blue Bell* court held specifically that the Texas Supreme Court "ha[d] not addressed" the question whether a CGL policy covers all damages tangentially related to bodily injury, and so it followed the *ACE* line of cases. 73 F.4th at 333-34.[11]

**Property damage**: Finally, Primary argued before the District Court that the Underlying Suits allege "property damage." ROA.42 p. 20. But its examples of supposed property damage—allegations of robberies carried out with ghost guns, or streets too dangerous to walk because of ghost guns, *see id.* p. 20 n.28—do not fit the Policies' definition of property damage, which (in pertinent part) is "[p]hysical injury to tangible property" including "[l]oss of use of tangible property that is not physically injured," A.26. Even absent that initial definitional issue, Primary's arguments regarding property damage have the same flaw as its arguments regarding

---

[11] Primary also contended before the District Court that the *ACE* line contradicted New York law. ROA.42 pp.18. But it now agrees Texas law applies, *see* Primary Br. at 2, so that argument is forfeit.

"damages because of 'bodily injury'":  there is no specific, identifiable piece of property that suffered specific, identifiable injuries mentioned in the Underlying Suits.  Just as vague references to bodily injury generally do not suffice to allege "damages because of 'bodily injury,'" *see supra* at 40-43, vague references to generalized property damage do not suffice to allege "damages because of ... 'property damage.'"

## III.   There Is No Reason To Certify This Case To The Texas Supreme Court.

In a last-ditch effort to forestall affirmance, Primary also suggests that this Court should certify the occurrence question to the Texas Supreme Court.[12]  Primary Br. 26-29.  "Issues of state law are not to be routinely certified to the highest court of [a state] simply because a certification procedure is available.  The procedure must not be a device for shifting the burdens of this Court to those whose burdens are at least as great."  *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 370 (2d Cir. 1999).  Instead, "[c]ertification is to be used in those cases where there is a split of authority on the issue, where [a] statute's plain language does not indicate

---

[12] Although Primary has not sought certification of the "damages because of 'bodily injury'" issue, this Court should reject any such request should Primary make it on reply.  The Texas Supreme Court has been clear that it will follow a consensus: "[W]hen identical insurance provisions will necessarily be interpreted in various jurisdictions, we think it prudent to strive for uniformity as much as possible." *Cowan*, 945 S.W.2d at 824.  Such a consensus exists here, *see supra* at 40-43; indeed, the *Blue Bell* court applied the consensus rule as Texas law in that case, and it did so without even hinting that certification was a consideration.  *See* 73 F.4th at 332-36. Of course, this Court need not reach this issue if it affirms on occurrence grounds.

the answer, or when presented with a complex question of [state] common law for which no [state law] authority can be found." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) (internal quotation marks omitted). In other words, "exceptional circumstances" must be present to "justify using the certification procedure." *Id.* For at least three reasons, no such circumstances exist here.

*First*, there is no "complex question of [state] common law for which no [state law] authority can be found." *Id.* As discussed above, Texas law on the question of when an intentional act with unintended consequences can be an accident is clear: it is an accident only when those consequences could not have been reasonably anticipated by the actor. *See, e.g., Cowan*; 945 S.W.2d at 827; *Lindsey*, 997 S.W.2d at 155; *Blue Bell*, 73 F.4th at 330. So too, for that matter, is Texas law on complaints that actually allege negligent conduct; if the complaint alleges actual negligent conduct, instead of merely using the word "negligently" as an ornament, then there can be a duty to defend. *See, e.g.*, *Nokia*, 268 S.W.3d at 492.[13] The District Court experienced no trouble at all in applying that clear law here.

---

[13] Indeed, Primary opens the section of its brief dealing with certification by claiming that "there is sufficient precedent for this Court to resolve this appeal within the rubric of *Nokia*." Primary Br. at 26. As discussed *supra* at 27-36, Primary is wrong that this is a negligence case, meaning that *Nokia* is inapplicable. But it is notable that Primary admits that even its preferred strain of Texas law is clear enough for this Court to apply it without resort to certification.

Primary attempts to avoid that obvious conclusion by claiming that "[t]here is no Texas case addressing completed operations coverage arising out of the sale of firearm products." Primary Br. at 28. True enough, but any litigant could frame a question that narrowly and claim no case has squarely addressed that overly specific issue (and it is worth noting that Primary clearly frames it this way in a futile attempt to avoid the occurrence requirement, which as discussed above does apply to products claims). Applying well-established law to relatively new factual patterns is routine and unremarkable for this, or indeed any, federal court; if the fact that the precise factual scenario at issue in a diversity case had never occurred before a state court was enough for certification, then certification would be anything but "exceptional." *DiBella*, 403 F.3d at 111.[14]

*Second*, and relatedly, the gains from certification here would be minimal. As discussed previously, Primary has framed its requested certification extremely narrowly in order to claim (inaccurately) that there is no controlling Texas case law on the occurrence issue. That is most apparent in the specific wording of its requested certification: "Under Texas law, does a lawsuit alleging that a firearm retailer negligently caused injuries to others through its sales of unfinished frames and receivers potentially allege an 'occurrence' under products-completed

---

[14] The other conditions identified by the *DiBella* court—a split of authority or lack of a plain-language reading of a statute, 403 F.3d at 111—are obviously not present here.

operations liability coverage?" Primary Br. at 29. For the Texas Supreme Court's hypothetical ruling on the certification that Primary requests to control any future case, the insured would have to be (i) a firearms retailer subject to a lawsuit alleging that the retailer (ii) negligently (iii) caused injuries to others through its sales of unfinished frames and receivers, and the retailer would need (iv) products-completed operations liability coverage. So any ruling by the Texas Supreme Court could conceivably apply only to a very small set of hypothetical future cases; a narrow question like what Primary offers can only produce a narrowly applicable opinion. In those circumstances, there is even less of a reason for this Court to break from its usual view that "issues of state law are not to be routinely certified to the highest court" of a state. *Elliott Assocs.*, 194 F.3d at 370 (internal quotation marks omitted).

*Third*, and finally, there are notable drawbacks to certification here. This Court has recognized several of them, including "substantial increase to the expense the parties incur," "inevitable delays [in] the resolution of the case," and an undermining of "federalism interests." *53rd St., LLC v. U.S. Bank N.A.*, 8 F.4th 74, 81 (2d Cir. 2021). Taking the last point first: "The Constitution expressly establishes a right for litigants in cases 'between Citizens of different States' to have their dispute resolved by a federal court." *Id.* (quoting U.S. Const. art. III, § 2, cl. 1). But "[w]hen a case is litigated in the diversity jurisdiction of the federal courts," as the *53rd St.* court pointed out, "certification of a determinative question to the State

court substantially undermines the diverse litigant's entitlement to the federal forum, because certification will often result in a State court determining the outcome of the case." *Id.* That would be a consequence of certification here. Moreover, certification will substantially increase the parties' expenses. And the delays attendant on certification here would be significant, too, given that the Insurers filed this case more than a year-and-a-half ago. The drawbacks to certification here are substantial, while the gains from certification are minimal at best.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the judgment of the District Court.

Dated:        April 30, 2025

<div style="margin-left:40%">

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By: */s/ Christopher J. St. Jeanos*
Christopher J. St. Jeanos
James Fitzmaurice
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
212-728-8000
cstjeanos@willkie.com
jfitzmaurice@willkie.com

</div>

John B. Goerlich
WILLKIE FARR & GALLAGHER LLP
1875 K St. NW
Washington, DC 20006
202-303-1000
jgoerlich@willkie.com

*Attorneys for Plaintiffs-Appellees*

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B)**

This brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 12,964 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). In preparing this certificate, I relied on the word count program in Microsoft Word.

Dated:  April 30, 2025                    */s/ Christopher J. St. Jeanos*
                                          Christopher J. St. Jeanos